Susan **HOLLINGSWORTH, R.N.,** Jennifer **Bertaut, R.N.,** Debra **Stuart, R.N.,** Britt **Berrett, Ph.D., Fache,** Abnor **Sindhu, R.N.,** Rachel **Isaac, R.N.,** Gay **Acedo, R.N.,** Jackie **Laran, R.N.,** Isaac **Dada,** Emmanuel **Iwuoha,** Phenita **Wilson, R.N.,** and Nury **Mandujano, Appellants,**

v.

Adriane **SPRINGS,** Individually and as Next Friend of Ron Springs, **Appellee.**

No. 05–10–01215–CV.

Court of Appeals of Texas, Dallas.

Aug. 30, 2011.

Michelle E. Robberson, Richard Clark Harrist, Diana L. Faust, R. Brent Cooper, Cooper & Scully, P.C., Dallas, TX, for Appellants.

Les Weisbrod, Max Edward Freeman II, Lawrence R. Lassiter, Miller Curtis & Weisbrod, L.L.P., William A. Newman, The Bassett Firm, Dallas, TX, for Appellee.

Before Justices MORRIS, MOSELEY, and FITZGERALD.

## OPINION

Opinion By Justice FITZGERALD.

Appellee Adriane Springs sued these twelve appellants alleging that each was negligent and caused injury to her husband, Ron Springs ("Springs"), during his hospitalization at Medical City Dallas. Pursuant to Chapter 74 of the Texas Civil Practices and Remedies Code, appellee served three expert reports addressing her claims against appellants. Appellants objected to the reports on a number of grounds and filed motions to dismiss the claims against all appellants. In the end, the trial court denied all motions to dismiss. For the reasons discussed below, we affirm the trial court's rulings in part and reverse and remand in part.

### Background

Our factual recitation is based upon appellant's live pleading. Springs was admitted to Columbia Hospital at Medical City Dallas Subsidiary, L.P. ("Medical City") for minor surgery, i.e., to have a small cyst removed from his left forearm. No pre-operative laboratory studies were ordered. He was first seen by an anesthesiologist at

approximately 4:23 p.m.[1] Approximately five minutes later, the anesthesiologist placed an external jugular intravenous line and began to administer Diprivan to induce general anesthesia. She inserted a laryngeal mask airway ("LMA"), but Springs began experiencing breathing difficulty. The anesthesiologist removed the first LMA and inserted a second, but Springs's breathing difficulty continued. The anesthesiologist then pharmaceutically induced a paralyzed state in order to intubate Springs, but she was unable to intubate him. Springs suffered a cardiopulmonary arrest and was resuscitated. At the time this pleading was filed, Springs was non-responsive to verbal commands. The Court has been notified subsequently that Springs has passed away.

Appellee initially filed suit against a number of physician and hospital defendants. She amended her petition to add these appellants as defendants. Appellee's pleadings identify appellants, as of the time of Springs's hospitalization, in this manner:

- Britt Berrett, Ph.D., FACHE, was the president and CEO of Medical City.

- Susan Hollingsworth, R.N., was the Director of Nursing.

- Jennifer Bertaut, R.N. was the Nursing Director.

- Debra Stuart, R.N. was the Nurse Manager.

- Jackie Laran, R.N. was the Charge Nurse.

- Gay Acedo, R.N., Rachel Isaac, R.N., Nury Mandujano, and Phenita Wilson, R.N. were nurses on the staff of Medical City.

- Abnor Sindhu, Isaac Dada, and Emmanuel Iwuoha were anesthesia technicians.

Appellee filed and served expert reports and curriculum vitae ("CVs") from three experts: Scott Groudine, M.D., an anesthesiologist; Charles M. Brosseau, Jr., FACHE, a consultant on health care administration; and Yvette Rosenthal, R.N., a perioperative nurse. Appellants filed objections to all reports and motions to dismiss from all defendants. The trial court heard the motions to dismiss and denied all motions except the joint motion filed on behalf of Hollingsworth, Bertaut, and Stuart (collectively, the "Administrative Nurses"). The trial court found that Brosseau's report failed to establish his qualifications to opine concerning the standard of care and breach with respect to the Administrative Nurses, but the court granted appellee thirty days to cure the deficiency. These rulings are contained in the court's June 28, 2010 order. Appellee filed a supplemental report from Brosseau, and the Administrative Nurses filed objections and another motion to dismiss. This time the trial court denied the motion to dismiss in an order dated September 9, 2010. Appellants have challenged both orders in this interlocutory appeal.

### Appellate Review of Chapter 74 Expert Reports

■ We review a trial court's rulings on the adequacy of an expert report under an abuse-of-discretion standard. *Am. Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). A trial judge abuses his discretion if he acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Downer v. Aquamarine Oper-*

---

1. The anesthesiologist, Dr. Joyce Abraham, is a defendant below but is not a party to this interlocutory appeal.

*ators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985). We will not find an abuse of discretion merely because a trial court may decide a matter within its discretion in a different manner than we would in a similar circumstance. *Id.*

■■■ A Chapter 74 expert report need not "marshal all the plaintiff's proof," but it must provide:

> a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (West 2011). A court shall grant a motion challenging the adequacy of a report only if the report does not represent an objective good faith effort to comply with the above-quoted definition of "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to meet two requirements: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A plaintiff need not present evidence in the report as if she were actually litigating the merits, and the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Palacios,* 46 S.W.3d at 879. But a report does not fulfill the statute's requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Id.* at 879. We may not "fill gaps" in an expert report by drawing inferences or guessing what the expert likely meant or

intended. *See Wright,* 79 S.W.3d at 53. Instead, the expert must explain the basis for his statements and must link his conclusions to the facts. *Id.* at 52. Finally, it is the substance of the opinions, not the technical words used, that constitutes compliance with the statute. *Baylor Univ. Med. Ctr. v. Rosa,* 240 S.W.3d 565, 570 (Tex.App.-Dallas 2007, pet. denied).

### Threshold Objections to Grouping of Defendants

■ Appellee has pleaded her claims against these appellants in groups of those who had the same or similar duties as health care providers. She makes the same specific charges of negligence against all members of each group. For example, she pleads claims against four administrative employees, and her theories of liability are the same for the four members of that group. Not surprisingly, the expert reports also group individuals as appellee has. Indeed, to a significant extent, appellants responded to the expert reports as groups and make their appellate complaints by groups. However, appellants repeatedly—below and in this Court— charge the expert reports are deficient because they fail to set forth the necessary elements of a Chapter 74 report applicable to each defendant. We disagree. The reports of Rosenthal and Brosseau carefully name and address all defendants and the standards of care (and breach thereof) applicable to them. The Groudine report addresses the standard of care (and breach thereof) applicable to the anesthesia technicians, and names them. And as to Groudine's causation opinions, he incorporates the reports of Rosenthal and Brosseau and, reading the reports together, it is apparent which group of actors is being discussed throughout the report. This is not a case in which the expert offers theoretical opinions without identifying any person who allegedly committed the viola-

tion of the standard of care. *Cf. Wood v. Tice*, 988 S.W.2d 829, 831–32 (Tex.App.-San Antonio 1999, pet. denied) (deposition giving standard of care opinions without identifying actor failed to satisfy statutory requirements for expert report). Nor is this a case in which the expert groups defendants together who have different standards of care for their dealings with a patient. *Cf. Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 246 (Tex.App.-Corpus Christi 2004, no pet.) (expert presented single standard of care for emergency room physician, hospital, cardiology association, and others). Thus, to the extent appellants contend appellee's expert reports must fail because they assign the same duties and obligations as to each of a group of defendants, we reject this contention and overrule appellants' objections. *See In re Stacy K. Boone*, 223 S.W.3d 398, 405 (Tex.App.-Amarillo 2006, orig. proceeding) (holding expert report was adequate on standard of care for multiple defendants when each defendant was involved in same type of care).

### Administrative Personnel's Motions to Dismiss

Appellee pleaded negligence claims against Berrett and the Administrative Nurses based on alleged errors in performing their administrative functions of the hospital to ensure the provision of safe patient care. Specifically, appellee contended these four appellants were negligent by:

Failing to ensure that the nurses, anesthesia technicians and other administrative personnel were adequately trained, tested, and re-trained to ensure clinical and administrative competencies;

Failing to ensure the attendance of appropriately competent anesthesia personnel for a patient with Ron Springs'

history of difficulty intubation and high anesthesia risk;

Failing to have and enforce appropriate policies and procedures; [and]

Failing to operationalize the policies in place and to ensure they were followed, including but not limited to:

 i. The organization-wide Competency Plan rules;

 ii. The organization-wide Patient Assessment rules;

 iii. The Admission: Patient rules;

 iv. The Pre–Admission of Patient rules;

 v. The Surgical Outpatient rules; [and]

 vi. The Surgery Scheduling rules.

Appellee also pleaded that Nurses Bertaut and Stuart were negligent in their administrative capacities by:

Failing to supervise the pre-operative and peri-operative assessment of Ron Springs;

Failing to follow the rules as set forth in the policies and procedures as set forth above;

Failing to ensure the attendance of appropriately competent staff for a patient with a history of difficult intubation and high anesthesia risk;

Failing to ensure that appropriate informed consent had been given by Ron Springs regarding anesthesia;

Failing to ensure appropriate risk assessment was done with respect to Ron Springs;

Failing to ensure that appropriate patient assessment was done with respect to Ron Springs; [and]

Failing to ensure that relevant data was communicated among caregivers.

In their objections to Brosseau's supplemental report of July 23, 2010, the Administrative Nurses continued to assert that

Brosseau was not qualified to render an opinion in this matter as to them and that Groudine's causation opinions are conclusory. In their motion to dismiss the supplemental report, the Administrative Nurses also contended Brosseau's report is conclusory on the issue of breach because Brosseau never indicates any specific act that the administrators should have taken to meet the standard of care.[2] In their first appellate issue, appellants challenge the trial court's decision to deny the Administrative Nurses' motion to dismiss.

### Brosseau's Qualifications to Opine Regarding Administrative Nurses

■ Appellants argue Brosseau does not meet the statutory requirements for offering opinion testimony that the Administrative Nurses departed from acceptable standards of care. Chapter 74 states an expert is qualified to give such opinions if he:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b). An expert's qualifications must appear within the report itself or the expert's CV. *Kettle v. Baylor Med. Ctr. at Garland,* 232 S.W.3d 832, 840 (Tex.App.-Dallas 2007, pet. denied).

Appellants assert that Brosseau is not, and has never been, a health care provider. They are incorrect. The definition of "health care provider" includes a manager or employee of a health care institution. TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(12)(A)(vii), (B)(ii). Appellants likewise assert that Brosseau has never practiced health care. Again, they are incorrect. Chapter 74 defines "health care" to include any act performed by a health care provider if it is related to a patient's medical care, treatment, or confinement. *Id.* § 74.001(a)(10). Moreover, Chapter 74 expressly includes departures from accepted standards of administrative services within its definition of a "health care liability claim." *Id.* § 74.001(a)(13). Finally, in terms of qualifying as an expert witness, the definition of "practicing health care" is expanded to include those who teach or consult in the field. *Id.* § 74.402(a).[3] In October of 2007, when Brosseau was admitted to Medical City, and in the summer of 2010, when the trial court considered the motions to dismiss,

---

**2.** Hospital administrator Berrett did not object to the supplemental report of Brosseau below.

**3.** Appellants' argument suggests that this expansion of the realm of health care for purposes of identifying qualified experts is really a narrowing of the pool of possible experts. But section 74.402 does not purport to redefine health care for purposes of expert reports. Instead, it adds two more areas of

expertise within the original category. *See* TEX. CIV. PRAC. & REM. ANN. § 74.402(a) ("For purposes of this section, "practicing health care" *includes* ..."; emphasis added); *see also Group v. Vicento,* 164 S.W.3d 724, 732 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (interpreting two additional categories as exclusive is "unnecessarily restrictive and is contrary to the plain and common meaning of the language of the statute").

Brosseau was a management consultant in the health care industry. Accordingly, Brosseau was consulting in a field involving the same type of health care as the Administrative Nurses, i.e., hospital management. *See Group*, 164 S.W.3d at 731 (section 74.402(b)(1) does not require expert to be practicing in same field, only in field of practice involving same kind of care). We conclude Brosseau satisfies the requirements of section 74.402(b)(1).

█ We likewise conclude Brosseau satisfies section 74.402(b)(2). Brosseau's report states he is familiar with the standard of care for hospital administrators and leadership personnel, including these Administrative Nurses. He asserts that throughout his career he has been responsible for this type of leadership position in hospital organizations and that the administrative and managerial functions at issue are well within his area of expertise.

█ And as to section 74.402(b)(3), Brosseau's graduate training is as a hospital administrator. His report and CV establish that he has had significant experience since at least 1980 as a hospital administrator in a supervisory capacity. Moreover, Brosseau continues to be involved in hospital administration through his consulting work. He is a fellow of the American College of Healthcare Executives. We conclude Brosseau's training and experience establish that he is qualified to offer expert opinions concerning accepted standards of care for health care providers providing administrative services that affect the treatment of patients like Springs. Again, Brosseau meets the requirements of the statute.

█ Appellants challenge Brosseau's qualifications by declaring that medical expert testimony is necessary when underlying issues involve the performance of medical procedures, and they cite *Reed v. Granbury Hospital Corp.*, 117 S.W.3d 404 (Tex.App.-Fort Worth 2003 no pet.). But *Reed* does not support a challenge to Brosseau's qualifications in this case. It states explicitly that "the standard of administrative care at a hospital may be established by lay testimony." *Id.* at 409. It goes on to make the unremarkable statement that medical expert testimony is required to address the underlying medical procedures. *Id.* This medical expert testimony is precisely what appellee has offered, through Groudine and Rosenthal, as to the underlying treatment of Springs by those individuals the administrators managed.[4] Brosseau does not need to be a nurse to establish the necessary prerequisites to this lawsuit against the Administrative Nurses. He needs to be an experienced hospital administrator.

A number of appellants' concerns regarding appellee's expert reports appear to be based on confusion caused by the two layers of claims urges by appellee. Her pleading alleges departures from accepted standards of health care against staff nurses and technicians who had, or should have had, direct contact with the treatment and care of Springs. These claims require expert medical support to survive Chapter 74's demands. Appellee's pleading also alleges that one reason those staff members failed in their health care responsibilities was because the staff's supervisors failed in their administrative responsibilities. These claims require a standard of care and breach of that standard to be sup-

---

4. Although the issue is not before us in this appeal, we know appellee has also offered medical expert testimony as regards the physicians who are also defendants in this case. *See Godat v. Springs*, No. 05–08–00791–CV, 2009 WL 2385569, at *5 (Tex.App.-Dallas 2009, no pet.) (concluding medical expert report addressing surgeon's conduct is adequate).

ported by expert administrative opinions. Despite appellants' interpretation of Brosseau's report, he explicitly states that he is not addressing any clinical conduct taken by the Administrative Nurses themselves. Instead, he explains, "the issues I address are whether or not they met the management, administrative and leadership responsibilities which are owed to patients."

We discern no abuse of discretion in the trial court's determination that Brosseau is qualified to give the opinions he gives in his supplemental report.[5]

### Administrative Standard of Care and Breach Thereof

 Appellants contend that, qualifications aside, Brosseau's opinions concerning standard of care and breach are conclusory and, therefore, deficient. Appellants really make two specific complaints under this heading: (1) Brosseau does not explain *why* the four administrators are subject to the same standard of care, and (2) Brosseau does not identify "any specific conduct that should have been done, but was not done" by the administrators. These contentions are without merit.

Brosseau explains in his supplemental report that he is addressing issues concerning whether Berrett and the Administrative Nurses "met the management, administrative and leadership responsibilities which are owed to patients." He then identifies the specific administrative responsibilities at issue in this case that all the administrators share:

- to ensure that the clinical and administrative staff is competent;
- to have and enforce appropriate policies and procedures and to make sure they are implemented;
- to make sure the clinical staff knows and understands the policies and procedures and follows them;
- to work together to define the required qualifications and competence of those staff who provide care, treatment and services.

What Brosseau has identified are core obligations of any administrator of an operation with a staff and a service to deliver. Certainly all management personnel must ensure the competency of their staff and must participate in developing, implementing, dispensing, and enforcing the policies and procedures that will govern members of the staff as they provide the service.[6] Each administrator exercises the same responsibilities for the staff supervised. Although we refuse to fill in gaps in experts' reasoning, we do not abandon our common sense when we review these reports. Given that Brosseau is addressing these most basic administrative practices, he did not need to explain why these four administrators were all governed by the same standards of care.[7]

---

5. Because we conclude Brosseau is qualified under section 74.402(b), we need not address appellee's argument that he is also qualified under section 74.402(d).

6. Thus, Brosseau also identifies a particular responsibility that the Administrative Nurses shared: to establish nursing policies and procedures, nursing standard of patient care, treatment and services and standards of nursing practice.

7. Appellants cite *Kettle,* 232 S.W.3d at 839–40, for the proposition that a "generalized statement without explanation that a uniform standard applies" can be deemed conclusory and deficient. This out-of-context quotation is not helpful. The *Kettle* expert report was nothing like Brosseau's. The *Kettle* report addressed a number of different specialists without explaining who had what responsibility:

> Cohen's report is independently deficient in lumping all the physician-defendants together, without describing their individual roles in Kettle's care. The report identifies no practice specialty of any defendant. The

We also reject appellants' argument that no specific breaching conduct is identified in Brosseau's supplemental report. The report is detailed and unambiguous. Not only does it identify the management failure, it describes the acts and omissions of the staff that evidence management failures. The report gives Brosseau's opinion on the administrative conduct that has been called into question and provides a sufficient basis for a court to conclude the administrative negligence claims have merit. Accordingly, it represents a good faith effort to comply with the definition of an expert report. *See Kelly Ryan Cook, P.A. v. Spears*, 275 S.W.3d 577, 586 (Tex.App.-Dallas 2008, no pet.). The trial court did not abuse its discretion by denying the Administrative Nurses' motion to dismiss on these grounds.

### Causation in Administrative Claims

■ All four administrators objected below to Groudine's causation opinions as conclusory. Along with identifying conduct by the nursing staff that proximately caused Springs's injuries, Groudine sets forth the following opinions concerning the administrators:

[H]ad the nursing staff been appropriately supervised and had the policies and procedures been followed, then as I set forth above, the injuries would have been avoided. . . . It is my opinion that the administrative negligence identified by Mr. Brosseau with regard to the failure to ensure nursing competence, the failure to enforce the hospital's policies and procedures, and the failure to ensure communication among the health care providers were proximate causes of Mr. Springs' injuries. Had the nurses

report does not opine but requires us to infer that the same standard applies to each of them and that they all breached it in the same way.

been competent and adequately assessed Mr. Springs, understood the significance of the assessment and communicated it to the other healthcare providers, the hypoxic brain injury would have been avoided. Further, had the policies and procedures in place been followed, the nursing staff or administration would not have allowed anesthesia to begin without a member of the surgical team being present. Thus the nursing negligence set forth in Nurse Rosenthal's report and the administrative negligence set forth in Mr. Brosseau's report were proximate causes of injury to Mr. Springs.

Reading this report with Brosseau's and Rosenthal's, we know the purportedly negligent conduct at issue for the administrators and for the staff they manage. Groudine states that the conduct identified by these other experts as negligence—both nursing and administrative—was the proximate cause of Springs's injuries. He specifically addresses the management responsibilities to ensure competence, enforce policies and procedures, and ensure proper communication among staff and physicians, and he opines that if these responsibilities had been appropriately performed, then Springs's brain injury would have been avoided.

An expert report on causation must provide a fair summary of the expert's opinions regarding the causal relationship between the purported failure to meet the standard of care and the injury suffered. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Thus, Groudine was required to link these failed management responsibilities to Springs's injuries; his report was required to explain how the

*Id.* at 839.

administrative breaches described proximately caused Springs's injuries. *See Wright*, 79 S.W.3d at 53. The report in our record is dated March 4, 2010; it states that it is a supplement to earlier Groudine reports dated March 3, 2008, and March 6, 2009. It may be that those earlier reports addressed more fully the links between the purported failures in the operating room and the conduct of the various actors. As we discussed above, there are layers of conduct at issue in this case. But we conclude that Groudine's March 4, 2010 report, standing alone, does not adequately explain why there would have been a different and better result if the hospital's management personnel had met their responsibilities. By way of example, Groudine does not explain here why Springs's injury would have been avoided if the anesthesiologist had not begun delivery of anesthesia until the surgeon was present, as the hospital's procedure required. We conclude Groudine's report is conclusory in its attempts to connect the administrative negligence identified by Brosseau with Springs's brain injury. We sustain appellants' first issue on this ground only.

### Anesthesia Technicians' Motions to Dismiss

Appellee pleaded negligence claims against anesthesia techs Sindhu, Dada, and Iwuoha based on an alleged failure to assure the alarms in the anesthesia circuit were properly functioning. Specifically, appellee contended appellants were negligent in the following manners:

The alarms on the anesthesia circuits were apparently not sounding during the failed effort to secure an airway and the resulting code. Thus, there was a failure to check the anesthesia circuitry prior to the attempted induction to ensure that the alarms were properly functioning; [and]

In the event that the alarms had been checked prior to the failed induction, then they were either turned off or disabled, thus compromising the attempted failed induction and the resuscitation effort.

In their second issue, appellants contend (1) Groudine did not establish he was qualified to give expert opinions concerning Sindhu, Dada, and Iwuoha, and (2) Groudine's report was inadequate to address all three necessary elements of an expert report. Our review of these three appellants' objections (which the three urged in a joint filing) and motions to dismiss (filed separately by Sindhu and jointly by Dada and Iwuoha) indicates the appellants challenged Groudine's qualifications to deliver standard of care opinions against them and his causation opinion, but not the substance of his standard of care and breach opinions. We will limit our review to the issues presented to the trial court.[8]

### *Groudine's Qualifications to Opine Regarding Anesthesia Technicians*

▆▆▆ Appellants contend that Groudine's report and CV do not demonstrate he is qualified to opine concerning the maintenance and operation of anesthe-

---

8. Appellants assert that Sindhu is a nurse and not an anesthesia tech. Rosenthal's report includes Sindhu among the nurses whose conduct she addresses. Sindhu's motion to dismiss challenges Rosenthal's standard of care opinions and says Groudine's should not be considered. However, at the hearing on the motions to dismiss and in this Court, Sindhu argues Groudine's opinions should govern because appellee has pleaded her claims against Sindhu as an anesthesia tech. We agree with this position. It is not our role to find facts concerning Sindhu's proper classification, only to determine whether appellee's expert's have sufficiently supported her pleadings against him to satisfy Chapter 74.

sia equipment. We disagree at the outset with this characterization of the standard of care opinion that is required and that is being offered. The question under this heading is the standard of care that anesthesia techs should meet in their operating room responsibilities. While those responsibilities include working with anesthesia equipment, Groudine's opinion must relate to the techs' conduct, not to "the maintenance and operation of anesthesia equipment." Groudine's CV establishes he is an anesthesiologist with decades of experience in clinical and academic settings. His report states that it is ultimately the anesthesiologist's responsibility to ensure the anesthesia circuit, including the alarms, is working properly. Thus, Groudine himself, in his career and practice, bore that same ultimate responsibility. We have no basis for speculating that he did not understand his own operating room responsibilities. Groudine goes on to say this responsibility to ensure the anesthesia circuit is working properly is shared between the anesthesiologist and anesthesia techs. Just as we know Groudine is qualified to testify concerning an anesthesiologist's responsibility concerning the anesthesia circuit, his experience makes him qualified to speak to that same responsibility if it is shared with another operating room worker. If a doctor is familiar with the standard of care for other health care providers based on his experience working with or supervising those providers, then he can be qualified to render an opinion. *Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 198 (Tex.App.-Houston [14th Dist.] 2009, no pet.).[9] We conclude Groudine is qualified to give standard of care opinions concerning the responsibility of an anesthesia tech in the operating room.

### Causation in Claims Against Anesthesia Technicians

■ Appellants complain that Groudine's causation opinion is conclusory. The report explains Groudine has been told the alarms were not sounding during the effort to secure an airway and the ensuing code. Groudine posits two possible reasons why the alarms might not have sounded, and he evaluates those reasons in terms of the techs' responsibilities:

> The anesthesia techs, Abnor [Sindhu], Isaac Dada and Immanuel Iwuoha, had a duty to check the anesthesia equipment and circuit after cleaning it from its prior use and setting it up for the next patient. Failure to do so is beneath the standard of care. If the alarms had not been checked prior to induction and were thus unknowingly turned off or disabled, this too is beneath the standard of care and compromised the attempted failed induction and the resuscitation effort.

If it is established that the techs failed properly to check the equipment after cleaning and setting it up and/or failed to check and assure the alarms were not turned off or disabled, then—according to Groudine—they were negligent, and that negligence proximately caused Springs's injuries.

The question is whether Groudine's opinions have adequately linked the conduct he has identified as necessary—properly checking the workings of the anesthe-

9. In oral argument, appellee's counsel referred the Court to an article listed on Groudine's CV titled "Anesthesiologists' Assistants: Being a (Care) Team Player." The article explores the use of anesthesiologists' assistants ("AAs"). According to the article, AAs are specially trained physicians' assistants who can, under the supervision of anesthesiologists, perform a number of tasks that assist in providing anesthesia. Although the article does not specifically address technicians, it does speak to the supervisory role of the anesthesiologist in all aspects of anesthesia provision.

sia circuit—with Springs's injuries. The opinion does not explain how the failure of the alarms can be tied to the brain injury. We cannot infer what the effect of the alarms working would have been or what the response to the alarms would have been; we cannot infer how the alarms, or the response to them, would have led to a better outcome for the patient. *See Wright,* 79 S.W.3d at 53. The expert's opinion must include these links to his conclusion. Because Groudine has not explained these links, we conclude his report is conclusory and, therefore, deficient on this theory of negligence. We sustain appellant's second issue on this ground only.

### Staff Nurses' Motions to Dismiss

In their third and fifth issues, appellants challenge the denial of various motions to dismiss based on the substance of Groudine's report. They contend the report fails to establish a causal connection between a number of appellee's pleaded theories of negligence and her husband's injuries. We address these challenges in turn.

### *Documentation Claims*

■ In her petition, appellee urges negligence claims based on errors in documentation against Laran, Isaac, Mandujano, Wilson, and Acedo. Specifically, appellee contended these appellants were negligent by:

Failing to provide appropriate assistance with respect to the resuscitation efforts, including documentation of who was performing specific interventions;

Failing to document an acceptable timeline about the order, duration or efficacy of emergency ACLS protocol interventions; [and]

Failing to have someone designat[ed] to keep realtime documentation with respect to the specific intervals or cardiopulmonary resuscitation and the specific sequence of drugs given.

In their third issue, appellants contend Groudine's report fails to address the element of causation concerning these documentation claims. Appellee responds that Groudine was not required to "replicate each allegation, fact, and opinion made by the other experts in their Chapter 74 reports." She asserts that Groudine "specifically references" the reports by Rosenthal and Brosseau, and she urges us to read the reports together.

We agree that one expert is not required to repeat material from other expert reports needlessly, and we agree that expert reports can be read together to satisfy the requirements of Chapter 74. *See* Tex.Code Civ. Prac. & Rem.Code Ann. § 74.351(i). But Groudine is appellee's causation expert. *See id.* § 74.403(a) (only physician may opine as to causation against health care provider). And an expert report on causation must provide a fair summary of the expert's opinions regarding the causal relationship between the purported failure to meet the standard of care and the injury suffered. *Id.* § 74.351(r)(6). Thus, Groudine was required to link whatever facts the other reports contained concerning documentation errors to Springs's injuries. *See Wright,* 79 S.W.3d at 53.

■ Our review of Groudine's report confirms appellants' contention that Groudine does not address the element of causation concerning alleged documentation errors.[10] An expert report that omits one of the specifically enumerated requirements of section 13.01(r)(6) cannot consti-

---

10. At oral argument, counsel for appellee conceded that Groudine's report does not address this element.

tute a good faith effort to meet the statutory requirements. *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex.2006) (citing *Palacios*, 46 S.W.3d at 879). In that situation, a trial court has no discretion but to dismiss the relevant claim. *Jernigan*, 195 S.W.3d at 94. Because Groudine's report does not address causation as to the documentation claims, the trial court erred in denying the motions to dismiss as to these claims filed by Laran, Isaac, Mandujano, Wilson, and Acedo. Moreover, because these documentation claims were the only claims asserted by appellee against Isaac, Mandujano, and Wilson, those appellants should have been dismissed completely from the lawsuit.[11] We sustain appellants' third issue.

### *Informed Consent Claims*

■■■■ Appellee pleaded negligence claims against nurses Laran and Acedo based on errors in obtaining informed consent from Springs before his surgery. Specifically, appellee contended these appellants were negligent by:

> Failing to ensure that Ron Springs had given appropriate informed consents with respect to anesthesia, including the anesthesia options and risks involved; [and]
>
> Failing to initiate the chain of command when appropriate informed consent had not been obtained from Ron Springs.

In their fifth issue, appellants contend, *inter alia*, that Groudine's report fails to address the element of causation concerning these informed consent claims. Appellee responds that expert reports are not required to address every action or omission mentioned in the pleading, and that no authority requires reports to "replicate point-by-point each and every factual allegation in a petition." We agree. However, an expert's report must address each *theory* of negligence raised by the plaintiff to avoid dismissal of that theory. *See Windsor v. Maxwell*, 121 S.W.3d 42, 51 (Tex.App.-Fort Worth 2003, pet. denied).

Groudine does not address the theory that these nurses failed to comply with their duties in obtaining informed consent. His report offers no opinion that the alleged errors proximately caused Springs's injuries, let alone how the errors might have caused those injuries. Because the report omitted any discussion of the element of causation, Groudine's report could not qualify as a good faith effort to meet Chapter 74's requirements as to the informed consent claims. *See Jernigan*, 195 S.W.3d at 94. The trial court had no discretion but to dismiss those claims against Laran and Acedo. *See id.* We sustain appellants' fifth issue's challenge to the informed consent claims against these appellants.

### *Chain of Command and "Call for Help" Claims*

■■■ Appellee pleaded two additional theories of negligence against nurses Laran and Acedo related to their failure to obtain assistance outside the operating room when they observed problems with Springs's care. Specifically, appellee asserted the nurses were negligent by:

> Failing to initiate the chain of command when Dr. Abraham started the procedure with only Ms. Acedo present, that is, without the surgeon and other personnel present; [and]
>
> Failing to timely call for help with the failed intubation.

Appellants concede in this Court that Rosenthal's report adequately sets forth the standard or care and breach aspects of

---

11. This resolution of the appeal for Mandujano means we do not need to address appellants' alternative argument on her behalf in their fourth issue.

these negligence theories. However, they contend that Groudine's causation opinions on the theories are conclusory. We agree.

 In relevant part, Groudine opined:

> [I]t is my opinion that the nursing negligence identified in Nurse Rosenthal's reports with regard to ... the circulating nurses' failure to timely call for help were proximate causes of Mr. Springs' injuries ... Had the circulating nurse, Ms. Acedo, or the scrub nurse, Ms. Mandujano, called for help as Nurse Rosenthal suggests prior to Dr. Abraham paralyzing Mr. Springs with 30 mg of rocuronium, it is likely that Mr. Springs could have been woken up and that his hypoxic brain injury would have been avoided ... Further, had help been called more timely and had the resuscitation efforts proceeded appropriately, the injury would have been avoided or certainly mitigated.

Groudine does opine in these excerpts that the failure to solicit assistance when problems arose in the operating room was a proximate cause of Springs's injuries. And he does speak to what would have been the better outcome if help had been called: Springs could have been awakened and the brain injury would have been miti-

gated or avoided. However, Groudine does not explain what actions would have resulted from the call for help (or initiation of the chain of command) that would have resulted in awakening Springs. Again, we are not permitted to infer how the solicitation of assistance would have remedied the situation; the causation expert must tell us. *See Wright*, 79 S.W.3d at 53. We conclude the report is conclusory—and therefore deficient—as to these negligence theories.[12] We sustain appellants' fifth issue's challenge to these two negligence theories to that extent.

### Opportunity to Cure

 Appellee has requested an opportunity to cure any deficiencies found in her expert reports. Chapter 74 provides that if elements of an expert report are found deficient, the court may grant one 30-day extension to the claimant to cure the deficiency. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). In the trial court, appellee was given the opportunity to cure the deficiency in her original expert report from Brosseau. Because all other challenges to the expert reports were denied, the trial court did not grant any extensions as to the reports of Rosenthal or Groudine.[13] This Court may remand for consid-

---

12. We reject appellants' argument that the report is based on conjecture and that it fails because of Groudine's use of the words "likely" and "could have been." Appellants' reliance on *Wright* for these objections is misplaced. Indeed, *Wright* rejects the argument that an expert's use of the word "possibility" in terms of a better outcome rendered his report deficient. *See Wright*, 79 S.W.3d at 53 (report's adequacy does not depend on expert's use of "magical words"). Instead, the outcome in *Wright* supports our own conclusion that the adequacy of a causation opinion depends on the expert's linking his conclusion to the alleged breach. *See id.*

13. Appellants misstate the record when they assert "Appellee has already been granted a

30-day extension to cure deficiencies in her section 74.351 expert reports, and those reports remain deficient after an attempt to cure." The trial court's July 14, 2010 order unambiguously grants appellee:

> thirty days from the date of the hearing in which to cure deficiencies in the report of Charles Brosseau, Jr. FACHE regarding Mr. Brosseau's qualifications to opine regarding standard of care and breach with respect to Susan Hollingsworth. RN, Jennifer Bertaut, RN, and Debra Stuart, [RN], pursuant to Tex. Civ. Prac. & Rem.Code § 74.351(c).

The trial court found no other deficiencies than the ones specified in this order, so no other opportunities to cure were granted.

eration of the section 74.351(c) extension if we find a report to be deficient after the trial court concluded it was adequate. *See Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008). "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby v. Santillan,* 346 S.W.3d 546, 554 (Tex.2011). That purpose is served by allowing a claimant to cure deficiencies, to the extent allowed by the Legislature. *Id.* at 556 ("An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable.").

Appellants point to the language of section 74.351(c) that allows *"one 30–day extension"* and contend appellee has already had that one extension with respect to the Administrative Nurses, so she is not entitled to another as to those defendants. The statute does not connect the opportunity to cure deficient reports to the *defendants* addressed in the report. Instead, section 74.351(c) connects an opportunity to cure a deficiency to the *report* found deficient.

A court may not provide opportunities to cure, however, when an expert report is "absent" as opposed to deficient. If an expert report fails to address all required elements of a claim, the trial court may not consider an extension. *See Samlowski v. Wooten,* 332 S.W.3d 404, 417–18 (Tex.2011). Thus, there can be no amendment that will allow appellee's documentation or informed consent claims to proceed.

In accordance with these authorities, we will direct the trial court on remand to consider granting appellee a thirty-day extension in order to cure deficiencies in Groudine's report concerning the causation opinions we have determined are conclusory.

## Conclusion

We dismiss appellee's claims relating to purported failures in documentation and obtaining informed consent. The March 4, 2010 Groudine report is conclusory in its causation opinions concerning claims against: Administrative Nurses Hollingsworth, Bertaut, and Stuart; anesthesia technicians Sindhu, Dada, and Iwuoha; and Laran and Acedo (only chain of command and call for help claims). Accordingly, we conclude the trial court abused its discretion in denying those parties' motions to dismiss on that ground. However, we remand this cause and direct the trial court to consider granting a thirty-day extension to cure deficiencies in Groudine's report. If the trial court decides not to grant the extension, then we order the trial court to dismiss the claims for which conclusory causation opinions were given. In all other respects, we affirm the orders of the trial court.