**Affirmed and Opinion Filed November 5, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-00186-CV

### THE UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, Appellant
### V.
### VERBA KLINGSICK, DIANA KLINGSICK, AND JANA CARRASCO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM R. KLINGSICK, DECEASED,
Appellees

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-07946**

## MEMORANDUM OPINION
Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Francis

The University of Texas Southwestern Medical Center files this interlocutory appeal, claiming the trial court abused its discretion by denying UTSWMC's motion to dismiss. In two issues, UTSWMC contends appellees Verba Klingsick, Diana Klingsick, and Jana Carrasco, Individually and on Behalf of the Estate of William R. Klingsick, deceased, failed to timely file an expert report satisfying the requirements of chapter 74 of the civil practice and remedies code. We affirm.

On July 23, 2010, William Klingsick had a lung transplant at UTSWMC; Southwest Transplant Alliance provided the transplanted lungs, and Vitrolife, Inc. manufactured the fluid used to preserve the lungs. William experienced "significant airway swelling and extrinsic obstruction of the airway bilaterally" and died of complications two days later. In a letter dated

October 19, 2011, UTSWMC informed Verba of a problem with the Perfadex preservation fluid used by STA for transportation of organs between October 27, 2009 and February 11, 2011. Specifically, the fluid was not maintained at the optimal pH level and, according to UTSWMC's letter, organ transplant patients "may have experienced more airway inflammation" as a result. In fact, STA used at least 9.5 times too much tromethamine or "THAM," an alkaline buffer Vitrolife provides with its Perfadex preservation fluid, resulting in a "significantly elevated pH" level. Appellees sued UTSWMC, STA, and Vitrolife for negligence and gross negligence, alleging that William's death arose from, among other things, the failure to maintain a proper pH level in the fluid used to preserve the transplanted lungs during transport. After appellees filed an expert report as required under chapter 74 of the civil practices and remedies code, UTSWMC filed objections, claiming the expert witness, Dr. Paul Sherman Brown, was not qualified and the report did not address a viable, meritorious cause of action against UTSWMC. The trial court denied UTSWMC's motion to dismiss, and this appeal ensued.

In its second issue, UTSWMC claims the trial court abused its discretion by denying its motion to dismiss because Brown was not qualified to render opinions on the standard of care. In its brief, UTSWMC complains only that:

> [n]owhere in the report or CV is it established that Brown is qualified to testify to the standards of care as both alleged in the petition as applicable to the healthcare staff, the nursing staff, the physicians involved, or [UTSWMC]. Likewise, there is no showing that Brown is qualified to testify about causation, if any.

We question whether UTSWMC has adequately briefed this issue. Although providing a standard of review and basic law on expert witness qualifications, UTSWMC does not explain what areas of expertise an expert should have in this case or how Brown's qualifications are lacking. There is no meaningful discussion of Brown's background or training, and UTSWMC fails to apply case law to the facts of this case. *See* TEX. R. APP. P. 38.1. Nevertheless, we have reviewed Brown's qualifications and conclude UTSWMC's complaint lacks merit.

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.) (adequacy of expert report); *Newman v. Graham*, 316 S.W.3d 197, 199 (Tex. App.—Dallas 2010, no pet.) (adequacy of expert qualifications). We will not reverse the trial court's ruling absent a clear abuse of discretion. *See Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006) (per curiam). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or acts in an arbitrary and unreasonable fashion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Chapter 74 states a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care if he:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (West 2011); *Hollingsworth v. Springs*, 353 S.W.3d 506, 515 (Tex. App.—Dallas 2011, no pet.).

Brown's report and fourteen-page curriculum vitae clearly outline his qualifications, and we briefly recount them here. He graduated from St. Louis University School of Medicine in 1986 and completed his residency in general surgery at Northwestern Memorial Hospital in Chicago. He then completed a research and clinical fellowship in cardiothoracic surgery at the cardiac surgery branch of the National Heart, Lung, and Blood Institute, National Institutes of Health, in Bethesda, followed by a residency in general surgery at Northwestern Memorial

Hospital in Chicago and a residency in cardiothoracic surgery at the Hospital of the University of Pennsylvania. He was an assistant professor of cardiothoracic surgery at the University of Texas, Galveston, from 1996 until 2000. Thereafter, he has been a cardiothoracic surgeon in private practice. Brown is currently board certified by the American Board of Thoracic Surgery, the American Board of Surgery, and the American Registry for Diagnostic Medical Sonography, and is a member of the International Society of Heart and Lung Transplantation and a member of the Texas Transplant Society. In addition, Brown has personally performed over one hundred lung transplants as well as a large number of harvests. He is the chairman of the department of surgery and chief of the division of thoracic surgery at Lancaster Regional Medical Center, Lancaster, Pennsylvania. He has numerous publications and has presented lectures and peer reviewed publications on lung transplants and the transplantation process. Brown states he is familiar with the standard of care for lung transplants as well as the standard of care for transporting lungs for transplant, and his medical training and work history substantiate this. In short, Brown's expert report and curriculum vitae establish he has the education, knowledge, training, skill, and expertise in the field of cardiothoracic surgery and lung transplantation. Under these circumstances, we cannot conclude the trial court erred by denying UTSWMC's objections to Brown's qualifications. *See Newman*, 316 S.W.3d at 202. We overrule the second issue.

In its first issue, UTSWMC claims the trial court abused its discretion by denying its motion to dismiss because Brown's expert report does not address the claims made by appellees.

The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). The chapter 74 expert report need not marshal all the plaintiffs' proof but must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of

–4–

care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011); *see Hollingsworth*, 353 S.W.3d at 514.

A court shall grant a motion challenging the adequacy of a report only if the report does not represent an objective good faith effort to comply with the statutory definition of "expert report." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). To constitute a good faith effort, the report must inform the defendant of the specific conduct the plaintiffs have called into question, and it must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.*

In their original petition, appellees alleged UTSWMC failed to:

a. preserve and/or maintain organs viable for William as an organ transplant recipient;

b. check the pH level of the organ transporting fluid before performing the operation at issue;

c. provide a healthy and viable organ to William as an organ transplant recipient;

d. follow appropriate organ transplant procedures;

e. assure its vendors were transporting organs at proper pH levels.

In his report, Brown states the normal course of events for a transplant center such as UTSWMC is to draft a standard of care, specifying what pulmonary preservation is to be used and what

–5–

specific ingredients and concentrations will be used. While many centers make their own preservation solution, UTSWMC relied on STA to make the solution. STA used Perfadex as the basic stock solution. Vitrolife delivers the Perfadex at an acidotic pH of 5.5 to provide stability to the solution during shipment and to prevent microbial contamination. This solution, however, is too acidic to be used without causing organ damage so Vitrolife provides a "side bottle" of THAM, a potent alkalotic buffer. THAM raises the pH of the Perfadex to neutral making it safe for use on harvested lungs. The THAM buffer comes in several concentrations ranging from 3% to 40%. The usual course of business is to use a 3% solution; although Vitrolife had been supplying a 3% THAM solution along with the Perfadex, Vitrolife changed the concentration to 40% without notifying STA of the change.

Brown notes that UTSWMC should have provided specific instructions and directions to STA about the proper volume of THAM to use to adjust the pH level of the lung transport solution. He also notes UTSWMC deviated from the standard of care by specifying STA use a specific volume of THAM to adjust the final pH of the solution without specifying the concentration of the THAM to be used. Brown also discusses the deviations from standards of care for STA and Vitrolife. He states these deviations, individually and jointly, caused the amount of the buffer added to be 9.5 times greater than it should have been which resulted in a very alkalotic preservation solution used on lungs transplanted into William.

Brown opines that the adverse effects of this extreme overdosage caused were "multifactorial and, in medical probability, caused the unfortunate outcome" of William's death. Because the donor lungs were flushed and immersed in the preservation solution with 9.5 times too much THAM, the lung tissue and blood vessels were exposed to the fluid with a significantly elevated pH for several hours between the time they were harvested and transplanted. Alkaline

fluids can cause burns, "the severity of which is related to a number of factors, including the pH of the agent and the length of contact time." Brown notes

> The incorrectly prepared, alkaline preservation fluid would indeed probably cause inflammation and irritation, and burns. The alkaline fluid would also have a propensity for causing additional adverse effects, including decrease in alveolar ventilation, hypoxemia, and ventilator depression. It would also have an adverse effect on arterial and venous endothelium with impaired smooth muscle contraction. This would then cause impaired cardiopulmonary blood flow, impaired blood perfusion within the lungs, and impaired gas exchange.
>
> Evidence of the above-mentioned toxic effects includes in Mr. Klingsick's case: marked erythema and edema of the lungs; "airway swelling"; "blue, almost ischemic lungs"; necrotic lung tissue; very poor lung compliance; and "small lung volumes." Furthermore, the combination of excessive THAM and injured lungs (and complications thereof), probably had resultant adverse systemic effects and contributed significantly to renal failure and coagulopathy.

He concludes these opinions are based on a reasonable degree of medical probability that had UTSWMC, STA, and Vitrolife acted in a reasonable and prudent manner, the constitution of the fluid would have been correct, William would not have been exposed to the toxic effects of the excessive THAM concentration, and William would not have experienced the complications mentioned and would have survived the transplant.

At a minimum, Brown's expert report addresses appellees' claim that UTSWMC was negligent for failing to assure its vendors were transporting organs at proper pH levels. *See Potts*, 392 S.W.3d at 631 (stating expert report need not cover every alleged liability theory to make defendant aware of conduct at issue and concluding claim not frivolous if that liability theory is supported). Because Brown's expert report adequately addresses at least one pleaded liability theory, it satisfies the statutory requirements. The trial court did not abuse its discretion by denying UTSWMC's motion to dismiss the case. *See Potts*, 392 S.W.3d at 632. We overrule UTSWMC's first issue.

We affirm the trial court's order denying UTSWMC's motion to dismiss.

/Molly Francis/

MOLLY FRANCIS
JUSTICE

130186F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE UNIVERSITY OF TEXAS
SOUTHWESTERN MEDICAL CENTER,
Appellant

No. 05-13-00186-CV          V.

VERBA KLINGSICK, DIANA
KLINGSICK, AND JANA CARRASCO,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF WILLIAM R.
KLINGSICK, DECEASED, Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-07946.
Opinion delivered by Justice Francis,
Justices FitzGerald and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees VERBA KLINGSICK, DIANA KLINGSICK, AND JANA CARRASCO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM R. KLINGSICK, DECEASED recover their costs of this appeal from appellant THE UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER.

Judgment entered this 5th day of November, 2013.

/Molly Francis/
MOLLY FRANCIS
JUSTICE