

# IN THE
# TENTH COURT OF APPEALS

### No. 10-12-00396-CV

**HILLCREST BAPTIST MEDICAL CENTER,**

                                                                        **Appellant**

 **v.**

**LURETTA DIXON,**

                                                                        **Appellee**

**From the 414th District Court
McLennan County, Texas
Trial Court No. 2011-5158-5**

## MEMORANDUM  OPINION

In three issues, appellant, Hillcrest Baptist Medical Center ("Hillcrest"), challenges the trial court's order denying its motion to dismiss health-care-liability claims filed by appellee, Luretta Dixon.  We affirm.

### I.    BACKGROUND

In this medical-malpractice case, Dixon alleges that an anesthesiologist improperly placed a central subclavian line in her artery rather than her vein after surgery at Hillcrest on October 15, 2009.  It is undisputed that Nick Manitzas, M.D.,

inserted the line and "performed anesthesia post-operative evaluation" of Dixon on October 15, 2009. In his evaluation, Dr. Manitzas requested a single-view chest x-ray to confirm the proper placement of the line. Jose Watson, M.D., read the x-ray and allegedly failed to note that the line was improperly placed in an artery rather than a vein. The line remained in use for ten days until a Hillcrest nurse, Stephanie Markum, R.N., detected and reported that the line had been misplaced. During those ten days, Dixon suffered seizures, a heart attack, and a stroke.

On October 25, 2009, a second single-view chest x-ray of Dixon was taken. Jeffrey Charles Gerik, M.D., read and interpreted the second x-ray. Dr. Gerik allegedly opined that the line inserted by Dr. Manitzas was properly placed. In any event, Hillcrest medical personnel ceased using the line at this time.

Dixon filed her original petition in this matter on December 22, 2011, asserting health-care liability claims against Hillcrest, Dr. Watson, and Dr. Gerik.[1] Less than 120 days later, on March 23, 2012, Dixon served Hillcrest with two expert reports—one drafted by Daniel M. Sykes Jr., M.D., and the other drafted by Julius Danziger, M.D. A week later, Dixon served Hillcrest with a third expert report compiled by Bethany Autumn Rankin, R.N.

Hillcrest subsequently objected to Dixon's expert reports, asserting that the reports were insufficient. Specifically, Hillcrest alleged that none of Dixon's expert reports constituted a good-faith effort to comply with section 74.351 of the Texas Civil

---

[1] Though the order is not included in the Clerk's Record, the docket sheet indicates that the trial court granted Dixon's motion to dismiss her claims against Dr. Gerik with prejudice.

Practice and Remedies Code because the reports did not adequately address: (1) the standards of care applicable to Hillcrest; (2) the manner in which Hillcrest allegedly breached those standards of care; and (3) the causal connection between the alleged breach and Dixon's injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011). Essentially, Hillcrest argued that Dixon's tendered expert reports were no reports at all within the meaning of Chapter 74. *See id.* And based on these arguments, Hillcrest moved to dismiss Dixon's lawsuit.

Dixon responded to Hillcrest's objections by arguing that the reports should be read together, as allowed by section 74.351(i). *See id.* § 74.351(i). Dixon further argued that her expert reports constituted a good-faith effort to comply with Chapter 74 because the reports called into question the conduct of Hillcrest employees and provided the trial court with a basis for concluding that her claims have merit. *See id.* § 74.351(r)(6). In the alternative, Dixon requested a thirty-day extension to cure any expert-report defects that may have existed. *See id.* § 74.351(c).

On June 4, 2012, the trial court granted Dixon's request for a thirty-day extension. Subsequently, on June 21, 2012, Dixon served Hillcrest with a supplemental expert report drafted by Dr. Sykes and an additional copy of Nurse Rankin's expert report.

Hillcrest once again objected to Dixon's expert reports raising substantially similar arguments that were raised in its original objections. Hillcrest also moved to dismiss Dixon's lawsuit on the basis that she failed to timely file adequate expert reports addressing her health-care-liability claims.

The trial court denied Hillcrest's motion to dismiss and objections to Dixon's expert reports. This accelerated, interlocutory appeal followed. *See id.* § 51.014(a)(9) (West Supp. 2012) (authorizing an interlocutory appeal from the denial of "all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351 . . . .").

## II. STANDARD OF REVIEW

We review all rulings related to Section 74.351 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *Jelinek v. Casas*, 328 S.W.3d 526, 538-39 (Tex. 2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). Although we defer to the trial court's factual determinations, we review questions of law de novo. *Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*, 363 S.W.3d 754, 757 (Tex. App.—Houston [1st Dist.] 2012, no pet.). A trial court has no discretion in determining what the law is, which law governs, or how to apply the law. *Poland v. Ott*, 278 S.W.3d 39, 45 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). An abuse of discretion occurs if the trial court fails to correctly apply the law to the facts or if its acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see Haskell*, 363 S.W.3d at 757 (citing *Petty v. Churner*, 310 S.W.3d 131, 134 (Tex. App.—Dallas 2010, no pet.)).

## III. APPLICABLE LAW

A plaintiff who asserts a health-care-liability claim, as defined by Chapter 74, must provide each defendant physician or health-care provider with an expert report

which provides "a fair summary of the expert's opinions" as of the date of the report regarding the applicable standards of care, the manner in which the care rendered failed to meet the applicable standards, and the causal relationship between that failure and the claimed injury. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6). "'The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits.'" *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011)).

When a plaintiff timely files an expert report and a defendant moves to dismiss on the basis that the report is insufficient, the trial court must grant the motion only if the report does not represent a good-faith effort to meet the statutory requirements. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). To constitute a good-faith effort, a report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiffs has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *see Wright*, 79 S.W.3d at 52.

A report cannot merely state the expert's conclusions about these elements; instead, the report must explain the basis of the statements and link the conclusions to the facts. *Wright*, 79 S.W.3d at 52; *see Jelinek*, 328 S.W.3d at 539-40. A report that merely states the expert's conclusions about the standard of care, breach, and causation is deficient. *Palacios*, 46 S.W.3d at 879. Further, a report that omits any of the statutory elements is likewise deficient. *Id.* In determining whether the trial court's ruling on a motion to dismiss was correct, we review the information contained within the four

corners of the report. *Wright*, 79 S.W.3d at 53. "The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

## IV. ANALYSIS

### A. Dixon's Original Expert Reports

In its first and second issues, Hillcrest alleges that the trial court abused its discretion in denying Hillcrest's motion to dismiss and objections to Dixon's original expert reports because the reports failed to address causation. As such, Hillcrest asserts that Dixon's expert reports were not a good-faith effort and that the trial court abused its discretion in granting Dixon an extension to cure her expert reports. We disagree.

In his report, Dr. Sykes stated the following, in relevant part:

> I have reviewed the medical records of Luretta Dixon from her admission to Hillcrest Baptist Medical Center in Waco, Texas, from October 15, 2009, through November 2, 2009.
>
> . . . .
>
> Dr. Manitzas placed a central subclavian line. In order to confirm proper placement of the line, Dr. Manitzas requested a single-view chest x-ray. In my opinion, by requesting the single-view chest x-ray of Ms. Dixon immediately following her surgery in order to confirm proper placement of the line, Dr. Manitzas satisfied the applicable standard of care. Although his placement of the central subclavian line was improper, being in the artery rather than the vein.
>
> . . . .
>
> Both Dr. Watson and Dr. Gerik failed to note that the central subclavian line had been improperly placed, being in the artery rather than the vein. The records confirm that for a period of at least ten (10) days the central subclavian line was placed in the artery rather than the vein, and during that ten (10) days the line was used to inject medications, was periodically

flushed, and was periodically used for sampling blood. The records confirm that during the course of this ten (10) days Ms. Dixon suffered seizures, a myocardial infarction or "heart attack," and a cerebrovascular accident or "stroke," all of which are extremely serious and adverse events with respect to Ms. Dixon's physical condition.

*Any* arterial cannulation, including cannulation of the subclavian artery, can by itself result in catastrophic consequences for a patient such as Ms. Dixon. Cannulation of the subclavian artery by Dr. Manitzas with respect to Ms. Dixon in reasonable medical probability caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization. Injection of medications using this line, blood sampling using this line, and high pressure flushing of this line in reasonable medical probability also caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization. The mere act of frequently injecting medications or flushing the line can also cause the adverse health events suffered by Ms. Dixon in this case, and in reasonable medical probability the frequent injecting of medications and flushing of the line also caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization.

(Emphasis in original). Dr. Danziger's report addressed the standard of care and breach elements. Nurse Rankin's report cannot be used to establish the causation prong required by section 74.351(r)(6). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C), 74.403(a); *Benish v. Grottie*, 281 S.W.3d 184, 205 (Tex. App.—Fort Worth 2009, pet. denied) ("Consequently, a nurse cannot offer an opinion in a statutory expert report on causation."); *see also Hillcrest Baptist Med. Ctr. v. Payne*, No. 10-11-00191-CV, 2011 Tex. App. LEXIS 9182, at **20-21 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.). Therefore, the focus of our analysis is on Dr. Sykes's expert report.

When an expert report has not been served within the required time frame because elements of the report are deficient, the trial court may grant one thirty-day extension to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *see also Ortiz v. Patterson*, 378 S.W.3d 667, 676 (Tex. App.—Dallas 2012, no pet.). The Texas Supreme Court has stated the trial court should err on the side of granting additional time to cure any deficiencies in expert reports. *See Scoresby*, 346 S.W.3d at 554 ("[T]rial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period."); *Samlowski v. Wooten*, 332 S.W.3d 404, 411 (Tex. 2011) (plurality op.) ("A trial court should therefore grant an extension when a deficient report can readily be cured and deny the extension when it cannot."); *Ogletree v. Matthews*, 262 S.W.3d 316, 320 (Tex. 2007). However, in both *Scoresby* and *Samlowski*, the Court reaffirmed that the thirty-day extension is only available where the report was timely served but deficient. *See Scoresby*, 346 S.W.3d at 549; *see also Samlowski*, 332 S.W.3d at 411.

Based on our reading of Dixon's originally-submitted expert reports, we cannot say that Dr. Sykes's original report was so deficient that the trial court was precluded from granting a thirty-day extension to cure any defects.[2] *See Scoresby*, 346 S.W.3d at 549-50; *but see Ortiz*, 378 S.W.3d at 676 ("However, when the expert report is absent,

[2] Reports may be considered together in determining whether a health-care-liability claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (West 2011); *see also Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied). A single report need not "address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i). But read together, the reports must provide a "fair summary" of the experts' opinions. *Id.* § 74.351(r)(6); *see Barber v. Mercer*, 303 S.W.3d 786, 791 (Tex. App.—Fort Worth 2009, no pet.); *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 187 n.2 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

rather than deficient, the trial court may not consider an extension.") (citing *Samlowski*, 332 S.W.3d at 404; *Hollingsworth v. Springs*, 353 S.W.3d 506, 524 (Tex. App.—Dallas 2011, no pet.)). We do not believe that the aforementioned language contained in Dr. Sykes's original report is so utterly devoid of substantive content as to disqualify the document as an expert report. *See Scoresby*, 346 S.W.3d at 549. Furthermore, this report was served by the statutory deadline and contains the opinion of an individual with expertise—Dr. Sykes—that the claim has merit and implicates conduct occurring while Dixon was a patient at Hillcrest. *See id.* at 557 ("We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated."). Therefore, we cannot say that Dixon's expert reports are so deficient as to not constitute an expert report at all.

And with regard Hillcrest's complaints about the causation element, we believe that Dr. Sykes's timely-served original report is, at worst, deficient and eligible for the thirty-day extension proscribed in section 74.351(c). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *see also Scoresby*, 346 S.W.3d at 549. Therefore, based on the foregoing, we cannot conclude that the trial court abused its discretion in denying Hillcrest's initial objections and motion to dismiss and granting Dixon a thirty-day extension to cure any defects in her expert reports. *See Jelinek*, 328 S.W.3d at 538-39; *Palacios*, 46 S.W.3d at 879. Accordingly, we overrule Hillcrest's first two issues.

**B.    Dixon's Supplemental Expert Report**

In its third issue, Hillcrest contends that the trial court abused its discretion in denying Hillcrest's motion to dismiss and objections to Dixon's supplemental expert report because the report does not sufficiently address causation.   Once again, we disagree.

In his supplemental report, Dr. Sykes opined, in relevant part, that:

> It is critical to confirm proper placement of a central line (Internal Jugular or Subclavian) and to confirm placement in the vein rather than the artery, because placement of the central line (Internal Jugular or Subclavian) in the artery rather than the vein can result in catastrophic consequences for the patient, particularly if the line is to be periodically used to inject medications, and periodically flushed, and periodically used for sampling blood.   Vasospasm, ischemia, thrombosis, embolism, and cerebral air embolism can all occur as a direct result of radial artery cannulation, injection, blood sampling, and high pressure flushing. Similar complications can occur with any arterial cannulation, including cannulation of the subclavian artery.   All of these potential problems and complications are well known to me and to any reasonably competent anesthesiologist in Texas . . . .

> I have reviewed the medical records of Luretta Dixon from her admission to Hillcrest Baptist Medical Center in Waco, Texas, from October 15, 2009, through November 2, 2009.   A central subclavian line was placed immediately following her surgery.   Unfortunately, placement of the central subclavian line was improper, being in the artery rather than the vein.

> . . . .

> *Any* arterial cannulation, including cannulation of the subclavian artery, can by itself result in catastrophic consequences for a patient such as Ms. Dixon.   Cannulation of the subclavian artery with respect to Ms. Dixon in reasonable medical probability caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization.

Injection of medications using this line, blood sampling using this line, and flushing of this line by the nursing staff at Hillcrest Baptist Medical Center in reasonable medical probability also caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization. The mere act of frequently injecting medications or flushing of the line can cause the adverse health events suffered by Ms. Dixon in this case, and in reasonable medical probability the frequent injecting of medications and flushing of the line also caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization. As indicated, all of these actions were performed, during the course of Ms. Dixon's hospitalization, by the nursing staff at Hillcrest Baptist Medical Center (injection of medications using the line, blood sampling using the line, flushing of the line). By using the central line to inject medications and to sample blood, and by flushing the line, the nursing staff at Hillcrest Baptist Medical Center in reasonable medical probability caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization. By failing to observe, detect, and promptly report to a treating physician the improper placement of the central line (i.e. that the line appeared to be placed in an artery rather than a vein), the nursing staff at Hillcrest Baptist Medical Center delayed action to correct the improper placement of the central line, and this delay—particularly for a period of ten days—in reasonable medical probability caused or contributed to the seizures, myocardial infarction or "heart attack," and cerebrovascular accident or "stroke" suffered by Ms. Dixon during the course of her hospitalization.

(Emphasis in original). In his report, Dr. Sykes also implicated Dr. Watson's conduct, and recounted additional nursing information contained in Nurse Rankin's report that also implicated Hillcrest.

Confining our review to the four corners of Dixon's expert reports, *see Wright*, 79 S.W.3d at 53, we believe that Dr. Sykes adequately articulated a causal link between Dixon's care at Hillcrest and the seizures, heart attack, and stroke she suffered as a result of the improper placement of the subclavian line. *See id.* at 52; *see also Jelinek*, 328

S.W.3d at 539-40; *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). Accordingly, we conclude that Dixon's expert reports informed Hillcrest of the specific conduct called into question and provided a basis for the trial judge to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 879. And as such, we hold that Dixon's expert reports constitute a good-faith effort to comply with section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Palacios*, 46 S.W.3d at 875; *Wright*, 79 S.W.3d at 52. Therefore, based on the foregoing, we cannot conclude that the trial court clearly abused its discretion in denying Hillcrest's objections and motion to dismiss. *See Jelinek*, 328 S.W.3d at 538-39; *Palacios*, 46 S.W.3d at 877. We overrule Hillcrest's third issue.

## V.    CONCLUSION

Having overruled all three of appellant's issues, we affirm the order of the trial court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed July 11, 2013
[CV06]