# NO. 12-21-00048-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PAMELA KALKA AND ROBERT KALKA,*<br>*APPELLANTS* | *§* | *APPEAL FROM THE 145TH* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *CHRISTOPHER N. WATTIGNY M.D.*<br>*AND ESS OF NACOGDOCHES, LLC,*<br>*APPELLEES* | *§* | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Pamela Kalka and Robert Kalka appeal the trial court's order granting a motion to dismiss filed by Christopher N. Wattigny, M.D. and ESS of Nacogdoches, LLC. In their sole issue, the Kalkas contend the trial court abused its discretion when it dismissed their suit for failure to comply with the Texas Civil Practice and Remedies Code Section 74.351 expert report requirement. We reverse and remand.

## BACKGROUND[1]

The Kalkas filed a healthcare liability claim against Dr. Wattigny and ESS, alleging that Dr. Wattigny negligently treated Pamela Kalka.[2] Specifically, Dr. Wattigny treated Kalka in the emergency room at Nacogdoches Memorial Hospital after Kalka experienced symptoms consistent with a cerebrovascular accident (stroke) while playing Bingo earlier in the evening. The Kalkas allege that Dr. Wattigny failed to conduct appropriate tests, note Kalka's last known

---

[1] The recitation of the facts in this opinion is based on the pleadings and evidence as they have been developed at this early stage of the litigation. We recognize that the parties have not yet conducted discovery.

[2] The Kalkas alleged a direct negligence claim against Dr. Wattigny, vicarious liability against ESS as Dr. Wattigny's employer via respondeat superior, and gross negligence against both defendants.

well time, and consider and provide a specific treatment that, if timely given, would have reduced or eliminated the effects of the stroke that she experienced.

After Dr. Wattigny and ESS answered the suit, the Kalkas served Dr. Wattigny and ESS the expert report of Dr. Salah G. Keyrouz. Dr. Wattigny and ESS filed a motion to dismiss the Kalkas' suit, alleging that Dr. Keyrouz's report was deficient. After a hearing, the trial court found the report to be deficient on causation but gave the Kalkas thirty days to cure the deficiency.[3] The Kalkas served an amended report, after which Dr. Wattigny and ESS filed another motion to dismiss, again alleging that Dr. Keyrouz's report was deficient on causation. After a second hearing, the trial court sustained the objections and dismissed the Kalkas' suit. This appeal followed.

## EXPERT REPORT

In the Kalkas' sole issue, they contend that the trial court abused its discretion in granting Dr. Wattigny and ESS's motion to dismiss their health care liability claim because Dr. Keyrouz's report sufficiently established causation at this stage of the litigation.

### Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). An abuse of discretion occurs if the trial court fails to correctly apply the law to the facts or if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). In exercising its discretion, it is incumbent upon the trial court to review the report, sort out its content, resolve any inconsistencies, and decide whether the report demonstrated a good faith effort to show that the plaintiff's claims have merit. *Van Ness*, 461 S.W.3d at 144. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Head v. Hagan*, 600 S.W.3d 375, 378–79 (Tex. App.—Tyler 2019, no pet.).

---

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (West Supp. 2021).

2

**Expert Report Requirements**

The Texas Medical Liability Act (TMLA) requires a claimant to serve an expert report early in the proceedings on each party against whom a health care liability claim is asserted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2021). The Texas Supreme Court has explained that "eliciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits." *Palacios*, 46 S.W.3d at 877. The purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). A valid expert report must fairly summarize the applicable standard of care; explain how a physician or health care provider failed to meet that standard; and establish a causal relationship between the failure and the harm alleged. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Potts*, 392 S.W.3d at 630.

A report need not cover every alleged liability theory to make the defendant aware of the conduct at issue, nor does it require litigation ready evidence. *Potts*, 392 S.W.3d at 631–32. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.* For the particular liability theory addressed, the report must sufficiently describe the defendant's alleged conduct. *Id.* Such a report both informs a defendant of the behavior in question and allows the trial court to determine if the allegations have merit. *Id.* If the trial court decides that a liability theory is supported, then the claim is not frivolous, and the suit may proceed. *Id.* If a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous. *Id.*

**Causation**

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Causation is often established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants. *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010). In other words, the plaintiff must present evidence "that it is 'more likely than not' that the ultimate harm or condition resulted

3

from such negligence." *Id.* (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.).

A report is deficient if it states only the expert's conclusions about the standard of care, breach of the standard of care, or causation. *See Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.). An expert cannot simply opine that the breach caused the injury. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539. Rather, the report must explain, to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539–40. The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.—Dallas 2010, no pet.) (expert report must contain sufficiently specific information to demonstrate causation beyond conjecture).

In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.—Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878). "We may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Ortiz*, 378 S.W.3d at 671.

**Discussion**

Dr. Wattigny and ESS, in their motion to dismiss, contended that Dr. Keyrouz's report was deficient on causation because it was speculative, conclusory, and failed to describe how Kalka's condition and outcome would have been any different had Dr. Wattigny complied with the standard of care. The trial court agreed. The Kalkas contend that Dr. Keyrouz's amended report satisfies the good-faith effort required to show to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented.

Dr. Keyrouz explained in his report that at 11:06 p.m. on June 30, 2018, Kalka, a fifty-five-year-old active smoker, sought medical attention in the emergency room at Nacogdoches Memorial Hospital. While playing Bingo, she displayed symptoms of dysarthria, facial

4

asymmetry, overall slowness/mild drowsiness, and vomiting. Kalka's daughter noticed that she suddenly developed symptoms such as a droop in her smile on one side and somewhat slurred speech while they were at the Bingo hall.[4]

Dr. Wattigny treated Kalka, who noted that Kalka suffered from impaired speech and loss of balance. Dr. Wattigny reported "no focal findings" in his neurological exam, and his diagnostic impression stated "other altered mental status, syncope" while also commenting, under "disposition" that Kalka had improved.

Kalka was thereafter admitted to the hospital under hospitalist Dr. David Thomas's care. Dr. Thomas, based on Kalka's medical history, along with his examinations and Kalka's symptoms, noted the possibility of a stroke. Two MRIs were performed, along with various other tests, revealing bilateral and vermian "cerebellar lesions" that suggested "possible strokes vs other possibilities including osmotic demyelination or demyelination abnormality." Dr. Keyrouz noted that a "brain and neck MRA" was also performed, revealing no major abnormalities, "specifically as it pertains to the posterior circulation." Accordingly, Kalka was seen by neurologist Dr. Blaise Ferraraccio, who believed that the lesions were most consistent with a stroke. Dr. Ferraraccio recommended various monitoring techniques and treatments such as antiplatelet therapy and anticoagulant therapy. Kalka was discharged from Nacogdoches Memorial Hospital on July 6, 2018, and admitted to inpatient rehabilitation. After apparently suffering a second stroke, Kalka was admitted to Longview Regional Medical Center on July 13, 2018, but was later discharged after receiving treatment on July 20, 2018. It appears from the report that Kalka was ultimately discharged to a rehabilitation facility in Houston.

As to how Dr. Wattigny's alleged negligence caused Kalka's injuries, Dr. Keyrouz explained in relevant part as follows:

> As I noted in my initial report, the quality of the documentation from the [e]mergency room is at best, suboptimal. Dr. Wattigny's documentation uses vague terminology, and he did not document checking for ataxia, describing the quality of speech, or testing gait. These are tests I would expect to see documented whenever a physician suspects a patient has suffered a stroke. The fact that Dr. Wattigny did not document them indicates he likely missed the diagnosis.
> As I noted in my initial report, whenever a physician diagnoses stroke, it is extremely important to note the patient's last-known well time. This is because, again as I noted in my initial report, the standard of care for patients who present between 0 and 4.5 hours from time of stroke

---

[4] Kalka's medical history also revealed that she had an event six months earlier, during which she exhibited numbness in one arm that resolved the following day. According to Kalka, she sought medical attention for this event, and diagnostic testing was reported to be normal, even though those records were not available for Dr. Keyrouz's review.

onset is to provide the patient IV rt-PA treatment. By conducting the appropriate tests and recording the last-known well time, the physician both provides the necessary data from which a decision to administer IV rt-PA treatment can be made and the measure of when it must be done to be effective. It further signals to the next physician the diagnosis of a possible stroke was already covered, and if treatment was not indicated, what was/were the reason(s). . . . Again, this is information that Dr. Wattigny failed to include in Mrs. Kalka's record. In reasonable probability, Mrs. Kalka displayed the same deficits in the emergency room that she later displayed when examined by the hospitalist, Dr. Thomas, but Dr. Wattigny did not document them or recognize their significance.

I would expect that a reasonable treating physician—seeing the documentation of deficits and last known well time that should have been present in the record, had Dr. Wattigny adhered to the standard of care—would have prescribed IV rt-PA, which would, in reasonable probability, have significantly increased Mrs. Kalka' s chances of a good functional outcome. Strokes are caused by blood clots that occlude blood vessels in the brain, cutting off blood flow to delicate tissue, and IV rt-PA breaks up the clot that causes the stroke. If this is done in a timely manner— within the 4.5 hour window mentioned in my initial and this report—it will, in reasonable probability, restore blood flow and oxygen delivery to brain tissue sufficient to allow a patient a full or near full recovery, with minimal lasting effects from the stroke. However, if a patient does not receive such treatment and in a timely manner, brain tissues will die from being starved of oxygen. This substantially raises the likelihood of long-term significant disability. Mrs. Kalka's records show severe dysarthria and incomprehensible speech, left-sided weakness, dysmetria in her hands and legs, and head and limb tremors. In reasonable probability, these consequences would have been alleviated or made less severe by prompt IV rt-PA treatment. Because Dr. Wattigny failed to provide the appropriate examination and documentation, Mrs. Kalka was never considered for such treatment and her opportunity for treatment closed.

Dr. Wattigny and ESS point to the portion of Dr. Keyrouz's supplemental report where he opines that had Dr. Wattigny timely prescribed the IV rt-PA treatment, it would "have significantly increased Mrs. Kalka's chances of a good functional outcome," arguing that this fails to satisfy the causation standard. We note that we must not review this statement in isolation, but we must instead review all the statements and opinions in the entire four corners of the report. *See Van Ness*, 461 S.W.3d at 143–44 (holding we must credit all factual statements and opinions of expert, not merely isolated portions of report); *see also Ortiz*, 378 S.W.3d at 671.

Contrary to Dr. Wattigny and ESS's contention, a review of the entire report on causation discloses that Dr. Keyrouz did more than merely opine that Kalka might have had the possibility of a better outcome, and his report required no inference to establish the causal connection. *Cf. Bowie Mem'l Hosp.*, 79 S.W.3d at 53. Dr. Keyrouz explained the nature of strokes, the appropriate treatment protocol under the circumstances, and how the treatment would have prevented or resulted in a less severe injury caused by Kalka's stroke. That is, Dr. Keyrouz explained that when Kalka presented to the emergency room, she exhibited symptoms consistent with a stroke, and the standard of care required appropriate examination and documentation, including the patient's last known well time. Dr. Keyrouz explained that this information would

6

have informed either Dr. Wattigny or other subsequent treating physicians such as Dr. Thomas of the appropriate treatment—IV rt-PA. Dr. Keyrouz opined that Dr. Wattigny failed to comply with the standard of care, and these actions foreclosed consideration of IV rt-PA treatment at a time when it would have been effective at restoring blood flow and oxygen delivery to the affected brain tissues. Dr. Keyrouz further explained that in reasonable probability, timely treatment would have alleviated or made less severe the damage suffered from Kalka's stroke. Specifically, he stated the treatment "will, in reasonable probability, restore blood flow and oxygen delivery to brain tissue sufficient to allow a patient a full or near full recovery, with minimal lasting effects from the stroke[; and that] if a patient does not receive such treatment and in a timely manner, brain tissues will die from being starved of oxygen." The adequacy of Dr. Keyrouz's report is not dependent on its use of any magic words. *See* ***Columbia Valley Healthcare Sys., L.P. v. Zamarripa***, 526 S.W.3d 453, 460 (Tex. 2017). Dr. Keyrouz explained, to a reasonable degree of medical probability, a chain of events beginning with Dr. Wattigny's alleged negligence that was a foreseeable substantial factor resulting in Kalka's injuries. *See* ***Jelinek***, 328 S.W.3d at 532–33; ***McKellar***, 367 S.W.3d at 485.

Furthermore, the fact that Dr. Keyrouz's report does not satisfy the standard of proof for causation at trial does not render it inadequate during this stage of the litigation. The ultimate evidentiary value of the opinions proffered by Dr. Keyrouz—whether there actually is a causal connection, rather than simply a stated one—is a "matter to be determined at summary judgment and beyond." *See* ***Abshire v. Christus Health Se. Tex.***, 563 S.W.3d 219, 226 (Tex. 2018) (per curiam); *see also* ***Miller v. JSC Lake Highlands Operations, LP***, 536 S.W.3d 510, 515–16 (Tex. 2017) (per curiam) (rejecting court of appeals analysis focusing on the believability of the expert's opinions, noting that at "this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort"). Accordingly, we hold that the trial court abused its discretion when it granted Dr. Wattigny and ESS's motion to dismiss the Kalkas' claims.

The Kalkas' sole issue is sustained.

## DISPOSITION

Having sustained the Kalkas' sole issue, the trial court's order is ***reversed*** and this cause ***remanded*** for further proceedings consistent with this opinion.

7

**BRIAN HOYLE**
Justice

Opinion delivered December 21, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 21, 2021**

**NO. 12-21-00048-CV**

**PAMELA KALKA AND ROBERT KALKA,**
Appellant
V.
**CHRISTOPHER N. WATTIGNY M.D. AND ESS OF NACOGDOCHES, LLC,**
Appellee

Appeal from the 145th District Court
of Nacogdoches County, Texas (Tr.Ct.No. C2035619)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, because it is the opinion of this Court that there was error in order of the court below, it is ORDERED, ADJUDGED and DECREED by this Court that the order dismissing PAMELA KALKA and ROBERT KALKA'S case be **reversed** and the cause **remanded** to the trial court **for further proceedings** in accordance with the opinion of this Court; and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*