

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00101-CV
_____

ANGELA HILTON, INDIVIDUALLY AND AS THE REPRESENTATIVE
OF THE ESTATE OF BARBARA JACKSON, Appellant

V.

MARK GIBBS, M.D., PARIS ORTHOPEDIC CLINIC, P.A., MARK CAMPBELL, M.D.,
ANDREW FRASER, D.O., PRMC HEALTHCARE GROUP, INC., PIA LIPPINCOTT, M.D.,
PRMC ER GROUP, INC., AND ESSENT PRMC, L.P., D/B/A PARIS REGIONAL HEALTH
F/K/A PARIS REGIONAL MEDICAL CENTER, Appellees

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 92471

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

Angela Hilton, individually and as the representative of the estate of Barbara Jackson (Hilton), filed a healthcare liability claim against Mark Gibbs, M.D., and the Paris Orthopedic Clinic, P.A.; Mark Campbell, M.D.; and Pia Lippincott, M.D. (Appellees), maintaining that Appellees' management of Ms. Jackson's medical issues fell below the accepted standard of care. In accordance with Section 74.351 of the Texas Civil Practice and Remedies Code, Hilton filed a timely expert report of Vineet Choudhry, M.D. (Report). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. Appellees filed objections and motions to dismiss, arguing that the Report was deficient as to the element of causation.[1] Following a hearing, the trial court granted Appellees' motions to dismiss and found that Appellees were entitled to the recovery of reasonable attorney's fees and costs of court. Furthermore, the trial court denied Hilton's request for an additional thirty days in which to cure any deficiencies in the Report.

Hilton files this interlocutory appeal,[2] arguing that the trial court abused its discretion when it granted Appellees' motions, and in the alternative, the trial court should have given her an additional thirty days in which to cure any alleged deficiencies in the Report.

We affirm the trial court's orders granting Appellees' motions to dismiss.

---

[1]Dr. Lippincott, who practices anesthesiology, also included in her motion to dismiss an argument that Hilton's expert lacked qualifications sufficient to opine on the standard of care applicable to anesthesiologists. Because we affirm the trial court's orders granting Appellees' motions to dismiss due to the deficiency as to the element of causation, we find it unnecessary to address Dr. Lippincott's additional issue.

[2]"A person may appeal from an interlocutory order" that "grants relief sought by a motion under Section 74.351(l)." TEX. CIV. PRAC. & REM. CODE ANN. § 54.014(a)(10).

2

## I.    Background[3]

Barbara Jackson was admitted to Paris Regional Medical Center on March 28, 2022, to undergo a hip replacement procedure that was to be performed by Dr. Gibbs.  The next day, Ms. Jackson began having abdominal pain and distension.  Post-operative medical procedures revealed a possible ileus.  Medical personnel subsequently inserted a nasogastric tube into Ms. Jackson's nose, resulting in the removal of "significant amounts of bilious fluid."

On March 30, 2022, Dr. Andrew Fraser was asked to consult on the ileus, and after reviewing a computed tomography scan (CT scan) of Ms. Jackson's abdomen and pelvis, he concluded that there was "no definitive evidence of a bowel perforation."  As a treatment plan, Dr. Fraser ordered an enema and electrolyte replacement and placed Ms. Jackson on "n.p.o." status (nothing by mouth).  On April 4, 2022, Ms. Jackson had an additional test that showed "dilated small bowel loops concerning for possible distal small bowel obstruction and/or ileus."  Ms. Jackson underwent another CT scan, which "show[ed] increased bowel gas and fluid within the [gastrointestinal] tract without evidence of obstruction . . . [that] could be related to mild ileus or gastroenteritis."

On or about April 8, 2022,[4] Ms. Jackson was once again tested, and the results of that test showed "persistent diffuse gaseous distention of small bowel loops compatible with ileus or obstruction."  Also, Ms. Jackson's chest x-ray from that day "was concerning for interval development of large volume of intraperitoneal free air, concerning for hollow viscus

---

[3]The factual background is taken from Hilton's pleadings and the Report.

[4]In some instances, Hilton states the test occurred on April 9, 2022.

perforation." Apparently, the radiologist, who read Ms. Jackson's chest x-ray, attempted to contact an unidentified physician by telephone to discuss her findings. The radiologist was unable to reach the physician, so she discussed her findings with a registered nurse who, in turn, agreed to provide the results of the x-ray to the physician.

In the late hours of April 8 or the early hours of April 9, Dr. Campbell allegedly met with Ms. Jackson's family members, informing them that he did not believe surgical intervention was a potential treatment option for the purpose of stabilizing Ms. Jackson. The family, however, remained insistent that the doctors move forward with surgery. Around that time, Dr. Campbell consulted with Dr. Lippincott about possibly performing exploratory surgery on Ms. Jackson. Dr. Lippincott purportedly agreed with Dr. Campbell's assessment that Ms. Jackson should not be subjected to surgery because it was too risky. Dr. Campbell asked Dr. Lippincott to speak with Ms. Jackson's family because she was "known for having a calming effect on patients and families."[5] Pursuant to his request, Dr. Lippincott spoke with the family members, but they remained unwavering in their position that Ms. Jackson undergo surgery. That same day, Ms. Jackson's family asked that she be discharged and then transferred to another hospital.

On April 9, 2022, Ms. Jackson was released from the Paris Regional Medical Center and transferred to a Dallas hospital[6] where, according to Hilton, physicians performed an exploratory laparotomy, finding that "she had a very large blown-out perforation of both her transverse and

---

[5]Lippincott maintains that her involvement in Ms. Jackson's case was limited to speaking to the family about the potential risks of Ms. Jackson undergoing an operation in her condition. Hilton asserts that Dr. Lippincott agreed with Dr. Campbell that Ms. Jackson was too unstable to undergo surgery.

[6]The Report states that the Dallas hospital's records showed that Ms. Jackson "was transferred from an outside facility with delayed presentation of perforated abdominal viscus and presented in multisystem organ failure with sepsis related to delayed treatment of perforated viscus."

4

sigmoid colon." A few days later, Ms. Jackson had another operation and was then placed in the intensive care unit, which, according to Appellees, included "ventilator support."

On April 20, 2022, Ms. Jackson required a tracheostomy tube, presumably as a result of breathing issues. According to the Report, on April 28, 2022, during a physical therapy session, the "tracheostomy [tube] became dislodged, and [Ms. Jackson] lost her airway. She coded and was taken urgently to the OR for replacement of her trach[eostomy tube]." Unfortunately, Ms. Jackson "did not recover and was transitioned to comfort care." She passed away on April 28.

## II.     The Adequacy of Dr. Choudhry's Expert Report

In her second point of error, Hilton maintains that Dr. Choudhry's Report adequately addressed causation and that the trial court erred when it found otherwise. In the alternative, Hilton contends that the trial court erred when it found that Dr. Choudhry did not make a good faith effort to comply with Chapter 74 of the Texas Civil Practice and Remedies Code's statutory requirements and when it refused to grant a thirty-day extension of time to allow Dr. Choudhry to cure any deficiencies contained in his Report.

### A.     Standard of Review

An appellate court reviews a trial court's decision regarding the adequacy of an expert's report for an abuse of discretion. *Baty v Futrell*, 543 S.W.3d 689, 693 (Tex. 2018) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001)). A trial court abuses its discretion when it fails to correctly apply the law to the facts or when it fails to apply the appropriate rules or principles. *Palacios*, 46 S.W.3d at 875. "Importantly, in determining whether the report is deficient, [an appellate court] may not draw any inferences; instead, courts

5

must consider only the information contained within the four corners of the report." *Morrison v. Asamoa*, 648 S.W.3d 628, 644 (Tex. App.—Eastland 2022, no pet.) (citing *Palacios*, 46 S.W.3d at 879).

**B.  Discussion**

In reaching his opinion, Dr. Choudhry reviewed Ms. Jackson's medical records from Paris Regional Medical Center and Texas Health Dallas.  He stated in his Report as follows:

> The standard of care when taking care of a patient postoperatively with an ileus is to look for changes in the patient's condition that may indicate a bowel perforation.  Bowel perforation can be a life-threatening condition that requires a high index of suspicion.  Should there be concern of a possible bowel perforation on an x-ray, the standard of care requires further imaging, such as a CT scan, and/or taking the patient for exploratory surgery.

> Ms. Jackson began having some worrisome symptoms on 3/29/22 when she developed abdominal distension.  She was diagnosed with a postoperative ileus and had an NG tube placed.  By 4/8/22, additional imaging showed concerns of hollow viscus perforation and the radiologist called the physician to discuss the findings, but she was only able to talk with a nurse who said she would relay the findings.  Standard of care would dictate that the nurse would relay those findings, however, the medical records are silent as to whether the nurse relayed the information and it is a breach in the standard of care to not relay this information.  Standard of care would dictate that Dr. Fraser or Dr. Campbell order a CT scan of the abdomen and pelvis upon learning of the results to determine where the perforation is located.  Standard of care at this point would also be prompt exploratory surgery to locate the perforation and repair the perforation.  Neither of these things occurred.

> Drs. Fraser and Campbell breached the standard of care by failing to order a CT scan of Ms. Jackson's abdomen on the morning of 4/8/22 when the radiologist notified the nursing staff of a hollow viscus perforation.  They further breached the standard of care by not offering exploratory surgery on 4/8/22.  Due to these breaches in the standard of care, surgery for Ms. Jackson was delayed, causing her to have multisystem organ failure with sepsis related to delayed treatment of perforated viscus.

During this period of time, the medical records reflect Dr. Gibbs was the admitting and attending physician. As such, he was made aware of Ms. Jackson's deteriorating condition and had a duty as the attending physician to oversee her care. The standard of care for Dr. Gibbs would be to order a CT scan on 4/8/22 and insist on exploratory surgery. If the general surgeon was unable or unwilling to perform exploratory surgery, the standard of care required Dr. Gibbs to initiate transfer to a facility that would be able to perform exploratory surgery.

On 4/8/22, Dr. Lippincott was consulted to discuss the possibility of exploratory surgery with Dr. Campell. Standard of care for Dr. Lippincott would be to recommend a CT scan and recommend prompt exploratory surgery to locate the perforation and repair the perforation. Dr. Lippincott's failure to recommend a CT scan be done, and recommendation to not perform exploratory surgery on 4/8/22 was a breach in the standard of care.

The failure to meet the standard of care by the nurse in reporting the results, and all physicians, as outlined above, in the treatment of Ms. Jackson's bowel perforation led to multisystem organ failure with sepsis. If Ms. Jackson had a CT scan to identify where the perforation was, and had Ms. Jackson been taken for exploratory surgery on 4/8/22, her perforation would have been found and repaired. Bowel perforation causes peritonitis, which can lead to sepsis if left untreated. The delay in treating the bowel perforation caused Ms. Jackon [sic] to suffer an infection that progressed to sepsis. An earlier diagnosis and correct treatment, i.e., surgery to repair the perforation, would have, more likely than not, prevented the infection from progressing to sepsis.

Dr. Choudhry concluded,

Ms. Jackson had a postoperative ileus diagnosed on 3/29/22 that was treated with an NG tube. By 4/8/22, she had a recognized bowel perforation on imaging. Despite this, Drs. Fraser, Campbell, Gibbs, and Lippincott failed to take any action until the following day on 4/9/22. Had a CT scan and exploratory surgery been done on 4/8/22, Ms. Jackson, more likely than not, would have had successful repair of her bowel perforation, and she would not have progressed to multiorgan failure and sepsis. If surgical intervention had taken place on 4/8/22, it is more likely than not that Ms. Jackson would have survived.

I render these opinions based on my review of the medical records, education, training, and experience. I reserve the right to amend or supplement these opinions as more information becomes available.

7

## 1. Appellees Required an Adequate Expert Report and Not a Mini-Trial

Hilton argues that Appellees were attempting to convert Dr. Choudhry's Report into a mini-trial by arguing that his Report was lacking certainty and detail. Maintaining that Hilton takes an overly simplified view of the requirements of a Section 74.351 expert report, Appellees contend that Dr. Choudhry failed to connect the facts of the case to the opinions in his Report.

"A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)). An expert report that satisfies these requirements, even if only as to one pleaded liability theory, allows the claimant to proceed with his entire suit against the health care provider. *Id.* at 630, 632.

Contrary to Hilton's contention, the record does not show that Appellees were seeking something akin to a mini-trial. Instead, they were arguing that the facts contained in Dr. Choudhry's Report were inadequate to show that their actions caused Ms. Jackson's death. In other words, Appellees chose to argue that Dr. Choudhry's Report omitted at least one of the requisite statutory elements of a healthcare liability claim, which they had the right to do. Accordingly, this Court finds that Hilton's argument is without merit.[7]

---

[7]Appellees agree with Hilton that Ms. Jackson underwent exploratory surgery, but they state that the attending physician "discovered perforations of the transverse and sigmoid colons." However, Hilton does not present a point of error or an argument; instead, Hilton stresses the "Appellees' failure to act expediently when put on notice of the ileus constituted negligence." Hilton then states, in part, "Dr. Choudhry's report guides that if an x-ray shows concern for a bowl [sic] perforation, 'the standard of care requires further imaging, such as a CT scan, as well as

8

## 2. Dr. Choudhry's Expert Report is Insufficient as to Causation

Hilton argues that Dr. Choudhry established in his Report that Appellees breached the standard of care by delaying treatment and that the delay caused Ms. Jackson "to further decline and ultimately suffer multisystem organ failure." In contrast, Appellees argue that Dr. Choudhry's Report lacked an adequate explanation regarding causation so "as to be no report at all." Furthermore, they maintain that his Report failed to "explain how or why each of the doctors' conduct proximately caused [Ms.] Jackson's injuries or death."

In 2017, the Texas Supreme Court explained:

> The Act's expert-report requirement seeks "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." Unquestionably, a plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim. While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can. The report need not use the words "proximate cause," "foreseeability" or "cause in fact." "[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'" And merely incanting words does not suffice. "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." In showing how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven:
>
>> Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred.

---

immediate exploratory surgery.'" Because Hilton does not present in this section an argument as to notice or the standard of care, this Court has nothing to discuss or determine.

*Zamarripa*, 526 S.W.3d at 460 (alteration in original) (footnotes omitted) (citations omitted) (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)). "This is the causal relationship between breach and injury that an expert report must explain to satisfy the Act['s]" requirements. *Id.* If a plaintiff fails to provide an adequate expert report, one in which one or more elements are found deficient, the trial court "shall . . . enter an order that: (1) awards to the affected physician . . . reasonable attorney's fees and costs of court incurred by the physician . . . and (2) dismisses the claim with respect to the [defendant], with prejudice to refiling the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *see Scoresby v. Santillan*, 346 S.W.3d 546, 553–54 (Tex. 2011).

Dr. Choudhry was not required to prove the entire case or to set out every known fact, but he was required to explain, factually, how Appellees' conduct caused Ms. Jackson's injuries, which in turn caused her death. The Texas Supreme Court explained in *Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010),

> When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion.

*Id.* at 536. Therefore, "expert testimony that the event is a possible cause of a condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did

10

not result from the evidence." *Id.* (quoting *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 707 (Tex. 1970)).  Furthermore,

> [t]he burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor.  Such evidence has no tendency to show that negligence did cause the injury.

*Id.* (quoting *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965)).  That is exactly what we have in this case.

In his opinion, under a section entitled "Standard of Care, Breach in the Standard of Care, and Causation," Dr. Choudhry states that by April 8, 2022, "additional imaging showed concerns of hollow viscus perforation."  He then explains that the radiologist called the physician to discuss her concerns, "but she was only able to talk with a nurse who said she would relay the findings," presumably to the physician.  Dr. Choudhry adds that the "[s]tandard of care would dictate that the nurse would relay those findings, however, the medical records are silent as to whether the nurse relayed the information and it is a breach in the standard of care to not relay this information."  He then turns to Drs. Fraser or Campbell's standard of care, stating, "Standard of care would dictate that Dr. Fraser or Dr. Campbell order a CT scan of the abdomen and pelvis upon learning of the results to determine where the perforation is located."  Dr. Choudhry opines further, "Standard of care at this point would also be prompt exploratory surgery to locate the perforation and repair the perforation.  Neither of these things occurred."  Dr. Choudhry reasons that had exploratory surgery taken place on April 8, rather than on April 9, Ms. Jackson would have avoided the injuries that eventually caused her death.

11

As can be seen above, a significant amount of Dr. Choudhry's analysis, and his resulting conclusion, was driven by a series of events in which (1) an unnamed radiologist was unable to speak to an unnamed physician on the telephone about "the very concerning nature of th[o]se findings" from Ms. Jackson's chest x-ray and KUB,[8] so (2), the unnamed radiologist spoke with a named registered nurse about "the very concerning nature of th[o]se findings," and (3) the same named registered nurse promised the unnamed radiologist that she would relay the findings to the unnamed physician, but (4) Dr. Choudhry concedes that the nurse may or may not have relayed the "concerning" findings to the unnamed physician.

Whether the named nurse, the unnamed radiologist, or the unnamed physician actually conveyed the additional information to Appellees before they made their allegedly negligent decisions (no further scans, no exploratory surgery) is simply not known, even according to Dr. Choudhry's own Report.[9] Despite that, he relied on those unknown facts to conclude that Appellees breached the standard of care. Simply put, Dr. Choudhry opined, without knowing the relevant facts, that Appellees should have ordered a CT scan of Ms. Jackson's abdominal area or performed exploratory surgery "*upon learning of the results*." (Emphasis added). He then concluded that because Appellees failed to do either of those things, Ms. Jackson passed away. And while this Court is aware that this case was in its initial phase at the time he prepared his

---

[8]A "KUB" refers to a type of X-ray. "A kidney, ureter, and bladder (KUB) x-ray may be performed to assess the abdominal area for causes of abdominal pain, or to assess the organs and structures of the urinary and/or gastrointestinal (GI) system." *Kidney, Ureter, and Bladder X-ray*, JOHN HOPKINS MEDICINE, http://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/kidney-ureter-and-bladder-xray (last visited December 15, 2025).

[9]In his Report, Dr. Choudhry refers to the nurse's standard of care in regard to the delivery of the unnamed radiologist's message to the unnamed physician. He stated, "Standard of care would dictate that the nurse would relay those findings, however, the medical records are silent as to whether the nurse relayed the information and it is a breach in the standard of care to not relay this information."

Report, incorporating incomplete factual assertions in the Report did not lend weight to Dr. Choudhry's final conclusion.

Notably, Hilton accuses Appellees of making negligent decisions that resulted in Ms. Jackson's sepsis, which then caused her death. However, Dr. Choudhry's statement as to when Ms. Jackson was diagnosed with sepsis differs from Hilton's claim in her petition. In his Report, Dr. Choudhry states as follows:

> It appears Ms. Jackson would not have been transferred but for her family being concerned that there was no plan for surgery.
>
> At 0033 on 4/9/22, Ms. Jackson was admitted to Texas Health Dallas. It is noted in the records that Ms. Jackson was transferred from an outside facility with delayed presentation of perforated abdominal viscus and presented in multisystem organ failure with sepsis related to delayed treatment of perforated viscus.

Yet, Hilton averred in her petition the following:

> That same day [April 9, 2022], . . . Ms. Jackson was discharged and admitted to a subsequent facility. Upon admission, Ms. Jackson underwent an exploratory laparotomy where it was discovered both her transverse and sigmoid colon were perforated. Ms. Jackson was then diagnosed with sepsis and multisystem organ failure related to delayed treatment of perforated viscus. . . . On or about April 28, 2022, Ms. Jackson passed away as a result of a perforated abdominal viscus, acute respiratory failure and septic shock.

Simply stated, Dr. Choudhry opines that Ms. Jackson developed sepsis before she left Paris Regional Medical Center while Hilton's petition states that, after her exploratory surgery at Texas Health Dallas, she was *then* diagnosed with sepsis. The difference between these two versions of events is of material importance if Dr. Choudhry claims the sepsis was, at least in significant part, the cause of Ms. Jackson's death.

13

Along the same lines, Dr. Choudhry opines that there is a direct link between Ms. Jackson's March 28 hip replacement surgery, which resulted in Appellees' allegedly negligent medical advice on April 9, and Ms. Jackson's death on April 28, an entire month later. Dr. Choudhry focuses on his conclusion, but he disregards other critical events that occurred between those two dates. For example, during those three to four weeks, Ms. Jackson was a patient in two different hospitals; underwent two invasive surgeries under a general anesthetic in both of those hospitals; was cared for by countless healthcare workers with varying degrees of knowledge; was subjected to a myriad of different tests, treatments, and procedures; required intensive care and ventilator support following a medical procedure that took place "a few days" after April 9; and received a tracheostomy on April 20. On April 28, her tracheostomy was dislodged by an unnamed source and/or in an unidentified manner during physical therapy and, on that same day, Ms. Jackson passed away. It is difficult, if not impossible, to determine which person or persons were negligent if, in fact, any of them were.

Dr. Choudhry also failed to include a considerable amount of relevant information in his Report. By way of example, Dr. Choudhry explains that Ms. Jackson had hip replacement surgery on March 28 at Paris Regional Medical Center, and within a day of the surgery, she developed "some abdominal distension." However, Dr. Choudhry did not identify the person who determined that Ms. Jackson developed "some abdominal distension," how that person came to that conclusion, or what type of healthcare worker made that determination. Furthermore, Dr. Choudhry stated that due to that diagnosis, a KUB was ordered. Again, he did not identify the person who ordered the KUB, what position that person held, or the position of

14

the person who interpreted the results. That type of information is critical in a case where a myriad of healthcare workers, with varying degrees of knowledge and different standards of care, are responsible for a patient's well-being for a significant amount of time, yet, a specific person (or persons) is named as the negligent party.

Here, Dr. Choudhry opined that Appellees' single recommendation to follow a more conservative treatment plan—as opposed to immediately proceeding with exploratory surgery—resulted in Ms. Jackson's death weeks later. Likewise, he made that determination regardless of the fact that many other healthcare workers were responsible for Ms. Jackson's care and were responsible for making countless decisions regarding her health concerns both before and well after Appellees made their allegedly negligent recommendation.

The most obvious example of this took place on the day Ms. Jackson passed away. Yet, Dr. Choudhry's Report practically disregards the incident as if it were of no consequence to his analysis. He did, however, direct the reader to April 28, 2022, simply explaining that Ms. Jackson's tracheostomy was dislodged. From the record, we learn that at some point, an unidentified healthcare professional, other than Appellees, determined that Ms. Jackson required a tracheostomy, which was placed on April 20. We do not know who made that decision, what type of healthcare professional that person was, or the reasoning behind the decision because it was not included in Dr. Choudhry's Report. Dr. Choudhry did refer to the date of April 28, 2022, in his Report. On that day, an unidentified healthcare professional, other than Appellees, determined that Ms. Jackson should participate in physical therapy despite her condition or perhaps because of her condition. Dr. Choudhry's Report did not say. Dr. Choudhry did explain

15

that during her physical therapy session that day, Ms. Jackson's tracheostomy "became dislodged, and she lost her airway." There is no information in Dr. Choudhry's Report regarding the circumstances surrounding that unfortunate event. Sadly, Ms. Jackson "coded and was taken urgently to the OR for replacement of her trach[eostomy tube]." Unfortunately, she did not recover and passed away several hours later. Yet, there is no information in Dr. Choudhry's Report as to what happened to cause Ms. Jackson to die mere hours after she received another tracheostomy. Yet, despite that relevant event, he concluded in his Report that "[h]ad a CT scan and exploratory surgery been done on 4/8/22, Ms. Jackson, more likely than not, would have had successful repair of her bowel perforation, and she would not have progressed to multiorgan failure and sepsis." He then concludes, "If surgical intervention had taken place on 4/8/22, it is more likely than not that Ms. Jackson would have survived." He reached that conclusion despite the fact that Ms. Jackson had exploratory surgery at Texas Health Dallas just hours after Appellees made their allegedly negligent recommendation to Ms. Jackson's family. Dr. Choudhry did not address how the several hours of delay in surgery was detrimental to Ms. Jackson's health, much less the cause of her death.

As is evident in this case, the facts contained in Dr. Choudhry's Report support several potential conclusions. Dr. Choudhry was required to demonstrate in his Report that he believed that Hilton could prove that Ms. Jackson died because of Appellees' allegedly negligent actions or omissions. However, it was not enough to show that Ms. Jackson's death might have occurred from Appellees' alleged negligence and from other causes not the fault of Appellees.

16

Moreover, Dr. Choudhry's Report does not adequately support a conclusion that, absent Appellees' allegedly negligent actions, Ms. Jackson would still be alive.

We overrule Hilton's first point of error.

## III.   Hilton's Alternative Argument

Hilton argues, in the alternative, that the trial court erred when it refused to grant a thirty-day extension of time to allow Dr. Choudhry to cure any deficiencies contained in his Report.

Section 74.351(c) confers upon a trial court the discretion to give a plaintiff an additional thirty days to cure a deficiency in an expert report in certain circumstances. *Scoresby*, 346 S.W.3d at 549 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c)). A trial court may grant a thirty-day extension if the report was served by the statutory deadline, contains an expert's opinion that the plaintiff's claim has merit, and the defendant's conduct is implicated. *Id.* at 557. A trial court's discretion under Section 74.351(c) is based on the need to dispose of frivolous claims and the need to preserve meritorious ones. *Id.* at 554. "A court may not provide opportunities to cure, however, when an expert report is 'absent' as opposed to deficient. If an expert report fails to address all required elements of a claim, the trial court may not consider an extension." *Hollingsworth v. Springs*, 353 S.W.3d 506, 524 (Tex. App.—Dallas 2011, no pet.) (citing *Samlowski v. Wooten*, 332 S.W.3d 404, 417–18 (Tex. 2011)). "In making that determination, a trial court may sometimes err and dismiss a claim when the report could have been cured." *Samlowski*, 332 S.W.3d at 411. "A reasonable error in judgment, however, is not an abuse of discretion." *Id.* (citing *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992))

17

("noting that reviewing court may not substitute its judgment as to factual matters committed to trial court's discretion").

We have previously required experts to explain the causal relationship between alleged breaches of the standard of care and medical outcomes that happened later, following intervening events:

> [Dr. Chand's expert report] faults Parmar for untimely postoperative diagnosis of a perforation. Yet, Chand does not explain what injuries, if any, could have been avoided had Parmar diagnosed the esophageal perforation earlier. The report fails to state whether, had the perforation been found after the first CT on April 18, Colburn could have avoided either the thoracotomy to repair the esophageal perforation or the other procedures performed by Kim [beginning on April 27]. It does not address whether Colburn, whose condition worsened after Kim's surgery, would have had a better outcome absent any negligence by Parmar . . . .

*Parmar v. Colburn*, No. 06-20-00093-CV, 2021 WL 1799867, at *7 (Tex. App.—Texarkana May 6, 2021, no pet.) (mem. op.). "There can be no analytical gap between a breach of the standard of care and the ultimate harm." *Tenet Hosps., Ltd. v. Barnes*, 329 S.W.3d 537, 543 (Tex. App.—El Paso 2010, no pet.).

As we explained above, Dr. Choudhry's Report failed to consider other significant risk factors and other equally plausible causes of Ms. Jackson's death. Because Dr. Choudhry's Report included an "analytical gap" between Appellees' alleged breach and Ms. Jackson's death that could not be cured without considering impermissible inferences, we find no abuse of discretion in the trial court's determination that a thirty-day extension of time to cure the causation defect would be in vain.

Accordingly, we overrule Hilton's alternative argument and affirm the trial court's denial of her request for a thirty-day extension to cure the defects in Dr. Choudhry's Report.

18

## V.    Conclusion

We affirm the trial court's orders granting Dr. Mark Campbell's motion to dismiss; granting Dr. Mark Gibbs and Paris Orthopedic Clinic, P.A.'s, motion to dismiss; and granting Dr. Pia Lippincott's motion to dismiss.


Charles van Cleef
Justice

Date Submitted:      June 25, 2025
Date Decided:        December 19, 2025